*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0484p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DOUGLAS CAMPBELL et al.,

> *Plaintiffs-Appellants,*

*v.*

No. 05-4483

PMI FOOD EQUIPMENT GROUP, INC. et al.,

> *Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 95-00222—Walter H. Rice, District Judge.

Argued: October 31, 2007

Decided and Filed: December 14, 2007

Before: DAUGHTREY and GILMAN, Circuit Judges; EDMUNDS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Dwight D. Brannon, BRANNON & ASSOCIATES, Dayton, Ohio, for Appellants. Teresa D. Jones, THOMPSON HINE, Dayton, Ohio, Brandi L. Dorgan, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, for Appellees. **ON BRIEF:** Dwight D. Brannon, Matthew C. Schultz, BRANNON & ASSOCIATES, Dayton, Ohio, for Appellants. Brandi L. Dorgan, Steven G. LaForge, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, Teresa D. Jones, THOMPSON HINE, Dayton, Ohio, Stacy M. Wall, CITY OF PIQUA LAW DIRECTOR, Piqua, Ohio, William J. Cole, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellees.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. PMI Food Equipment Group, Inc. closed its plant in Dayton, Ohio in 1995 and moved the operation to Piqua, Ohio after signing a tax-abatement agreement with the City of Piqua, Miami County, and the state of Ohio that resulted in favorable tax treatment for 10 years. In the process of closing its Dayton plant, PMI terminated all of the 66 hourly employees who worked there. The hourly workers and their spouses (collectively referred to as the "Workers") sued PMI, Piqua, Miami County, the state of Ohio, and various other parties,

---

[*] The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

asserting 33 causes of action arising under various state and federal laws in connection with the tax abatement, the closing of the Dayton plant, and PMI's termination of its hourly workers. All but two of the Workers' claims were dismissed by the district court, and the remaining two claims were resolved by the parties. The Workers timely filed this appeal. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.        Factual background

PMI operated a food-equipment parts and repair facility in Dayton (the Dayton Plant). In 1994, PMI decided to close the Dayton Plant due to the facility's age and inefficient operation. PMI applied to the City of Piqua in December of the same year for a tax-abatement agreement (the Agreement) in the Miami County enterprise zone. The Miami County Board of Commissioners (Miami County) had created the enterprise zone in Piqua to attract new business operations. Donald E. Jakeway, who was the Director of the Ohio Department of Development (ODD), was responsible for administering tax-abatement programs, including the one at issue.

The terms of the Agreement called for PMI to open a plant in Piqua (the Piqua Plant) in exchange for various tax breaks, including a 50% tax abatement until 2004 on all personal property used for business purposes in the Piqua Plant and a 50% tax abatement on any new real property added to the plant until 2005. During the negotiations over the Agreement, the Workers allege that PMI informed Piqua and Miami County officials that it was considering moving its plant to Kentucky, where the company had other operations, in the event that PMI did not receive the tax abatements from Piqua. They also claim that PMI in fact had no plans at the time to move to Kentucky. The Agreement was approved by the Piqua City Commission, Miami County, the state of Ohio, and Jakeway on January 26, 1995.

At the time that PMI closed the Dayton Plant, the company employed 98 people at that location, consisting of 32 salaried employees and 66 hourly employees. The hourly employees were covered by a collective bargaining agreement (CBA) between PMI and the International Union of Electronic, Electrical, Salaried, Machine, and Furniture Workers, AFL-CIO (the Union). According to the Workers' Third Amended Complaint (the Amended Complaint), the CBA was scheduled to expire in June of 1996. The CBA contained no provision requiring PMI to keep the Dayton Plant open. PMI planned to employ a staff of 77 at the Piqua Plant to fill 32 salaried and 45 hourly positions.

PMI informed the Dayton Plant's hourly employees in December of 1994 of the planned closure and their pending termination. The Workers allege that PMI initially told them that they would be laid off a few at a time, "first by handicap, then by seniority." On July 18, 1995, PMI informed them that they were all to be terminated the following Friday, July 26. Three days later, on July 21, PMI closed the Dayton Plant and all of the hourly employees were terminated.

All of the salaried employees from the Dayton Plant were retained to work at the Piqua Plant, but none of the hourly employees were allowed to keep their jobs. PMI filled the 45 hourly positions with individuals who were employed by a temporary employment agency. The Workers allege that, of the 66 hourly employees who were terminated, 51 were age 40 or over and that the average age of the hourly employees was 52. They also allege that the average age of the temporary Workers hired to replace them was 34.

### B.        Procedural history

In May of 1995, the Workers filed their initial complaint in the Montgomery County Court of Common Pleas in Dayton. PMI, Piqua, Miami County, the state of Ohio, Jakeway, the City of

Dayton, Dayton City Schools, and ODD were named as defendants. All of the defendants, except the Dayton City Schools and ODD, are appellees in this appeal. The case was removed to federal court in June of 1995. In October of the same year, the Workers filed their Amended Complaint, which set forth 33 causes of action. Shortly thereafter, the defendants filed motions to dismiss.

The district court issued an order in September of 1996 that granted in part and denied in part the defendants' motions to dismiss, and stated that its supporting opinion would be forthcoming. Nine years later, in February of 2005, the district court finally issued its opinion. It granted the motions to dismiss in their entirety as to the state of Ohio, Jakeway, and Miami County, and also granted the motions to dismiss with respect to all but two of the Workers' claims against the remaining defendants. (Both of the other claims were later resolved by the parties.) The Workers timely appealed the district court's judgment, limiting the issues on appeal to 8 of the 33 alleged causes of action.

## II. ANALYSIS

### A.    Standard of review

We review de novo a district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 451 (6th Cir. 2003). In reviewing a Rule 12(b)(6) motion to dismiss, "[f]actual allegations must be enough to raise a right of relief above the speculative level, . . . on the assumption that all the allegations are true (even if doubtful in fact)." *NicSand, Inc. v. 3M Co.*, 2007 WL 3010426 at *14 (6th Cir. Oct. 17, 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). We need not, however, accept as true legal conclusions or unwarranted factual inferences. *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000).

### B.    Constitutional claims

In their Amended Complaint, the Workers requested that the district court declare the Agreement "null and void" because it allegedly violated their due process and equal protection rights under both the U.S. Constitution and the Ohio Constitution. The court declined to consider the Workers' request, however, concluding that the issue was moot because the Agreement had already expired. On appeal, the Workers argue that the district court erred in dismissing their constitutional claims for mootness, and they also assert for the first time that the Agreement violated the Commerce Clause of the U.S. Constitution. But the Workers' belated Commerce Clause argument, just like their other constitutional claims that were timely raised, is subject to the mootness doctrine.

We have "no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue." *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 530 (6th Cir. 2001). A case is moot when "the issues presented are no longer 'live' or parties lack a legally cognizable interest in the outcome." *Id.* (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). That is, "a case becomes moot only when subsequent events make it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* (quotation marks omitted). An otherwise moot claim will not be dismissed, however, where it is "capable of repetition, yet evading review," such that "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subject to the same action again." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982).

In considering the potential mootness of a claim for declaratory relief, this court has explained that "the question is whether the facts alleged, under all the circumstances, show that there is a substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment." *Coal. for Gov't Procurement v. Fed. Prison Indus.*, 365 F.3d 435, 459 (6th Cir. 2004) (quoting *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974) (quotation marks omitted)).

The Workers argue that the district court's decision is "fundamentally unjust" because the issue would not have been moot if the district court had rendered its decision in a timely manner. Although they justifiably lament the district court's inordinate and inexplicable nine-year delay in deciding the defendants' motions to dismiss, they do not dispute that the Agreement expired in 2004. This fact is fatal to their claim because the Agreement is no longer in effect and no party has any continuing obligations under it. Granting declaratory relief would therefore have no effect on the Workers' current legal interests. Furthermore, the Workers have not alleged any facts to show that they might be subject to a similar tax-abatement agreement between the same parties in the future.

The issue of whether the Agreement is unconstitutional is, accordingly, no longer a "live" controversy, and there is no reasonable expectation that the Agreement will be revived to harm the Workers' legal interests. *See McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (holding that a request for a preliminary injunction ordering the plaintiff to be allowed to compete in the 1995 high-school basketball season was moot in 1997 because the plaintiff had already graduated, the season was over, and there were no more games to be played); *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) (holding that, because a resolution was no longer before the state senate and election results had already been voided under the resolution, declaratory relief would "have no effect on the parties' current legal interests"). The Workers' constitutional claims are therefore moot and the district court properly declined to grant a declaratory judgment.

To be sure, we look unfavorably upon lengthy, unjustified, and inexplicable delays on the part of district courts in deciding cases. *See, e.g.*, *Ball v. Wagers*, 795 F.2d 579, 581 (6th Cir. 1986) (criticizing a delay of five years and nine months). The law does not, however, recognize an exception to the mootness doctrine on the basis of inordinate delay. *See Big Rivers Elec. Corp. v. EPA*, 523 F.2d 16, 19 (6th Cir. 1975) (discussing the two exceptions to mootness). If the Workers were concerned about the inexplicable delay, they had the option to bring a mandamus action against the district court judge. *See Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943) ("The traditional use of the writ [of mandamus] in aid of appellate jurisdiction . . . has been to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so."). The Workers' failure to exercise this right diminishes the force of their mootness argument.

## C.    Fraud claims

In their capacity as taxpayers, the Workers next assert two claims of fraud against PMI, Piqua, Miami County, the state of Ohio, and Jakeway. Their first claim was brought on behalf of the Workers themselves, in their capacity as state and county taxpayers. This claim alleges that the Workers, as taxpayers, suffered damages as a result of PMI's alleged fraudulent misrepresentations to the city, county, and state during the tax-abatement negotiations. The second claim was brought in the form of a taxpayers' suit pursuant to Ohio's "taxpayer suit" statute, Ohio Rev. Code §§ 733.56, 733.59. This claim alleges that the Agreement "involved tax revenues that were intended for specific purposes, but were otherwise directed for private use by PMI."

The district court dismissed both claims on the ground that the Workers failed to satisfy the requirements for standing under Ohio's taxpayer-suit statute. But whether the Workers have standing to sue in federal court in their capacity as taxpayers "is . . . a federal question which does not depend on the party's prior standing in state court." *Coyne ex rel. Ohio v. Am. Tobacco Co.*, 183 F.3d 488, 495 (6th Cir. 1999) (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985)).

In other words, "standing is a matter of federal law, not state law." *Coyne*, 183 F.3d at 495 (ellipsis and quotation marks omitted). The district court's reliance on Ohio law in dismissing the Workers' taxpayer claims for lack of standing is therefore misplaced. *See id.* It should have begun its inquiry into the Workers' standing with an analysis under Article III of the U.S. Constitution.

> This court has set forth the three requirements for establishing Article III standing as follows:
>
> [A] plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be "fairly traceable" to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury. Hence, the "irreducible minimum" constitutional requirements for standing are proof of injury in fact, causation, and redressability. A plaintiff bears the burden of demonstrating standing and must plead its components with specificity.

*Id.* at 494 (citations omitted).

We need not engage in a lengthy analysis of either injury or causation because the Workers' fraud claims fail under the third requirement of redressability. They assert that the state and county "misdirected" and "misappropriated" tax revenues to fund the Agreement, and that they suffered damages as a result.

In *Coyne*, this court held that a group of Ohio taxpayers who, like the Workers, had challenged the expenditure of state funds, lacked standing because they could not show that a favorable outcome would result in either the receipt of a tax refund by them or a reduction in the tax bill for Ohio taxpayers generally. *See Coyne*, 183 F.3d at 496. The court explained that "[r]eimbursement of the public treasury would not necessarily redress Plaintiffs' claimed 'tax burden' injury because . . . the power to decrease state taxes or issue a tax refund rests within the province of the legislative and executive branches of the State of Ohio." *Id.*

Like the plaintiffs in *Coyne*, the Workers fail to allege that a victory in this suit would result in an increase in the public treasury to replace the amount of money "misappropriated" under the Agreement. Nor does their complaint raise a possibility that a favorable outcome would result in either the receipt of a tax refund by the Workers or a reduction in the tax burden for Ohio or Miami County taxpayers generally. Indeed, even if the Workers were to win and obtain money from PMI to replenish the public coffers, decisions about how to utilize a recovery of such funds would belong to the state of Ohio and to Miami County. *See id.* For these reasons, the Workers lack standing to bring their fraud claims in federal court.

## D.     Section 1983 claims

The Workers next allege that PMI deprived them of certain constitutional rights, in violation of 42 U.S.C. § 1983, when the company terminated them and moved the plant to Piqua. Their argument is difficult to understand, but appears to be that PMI's actions in terminating the hourly employees and moving operations to Piqua were "under the color of state law" because the actions were taken in connection with the Agreement, which was authorized and approved by state law and entered into by various government entities. The district court found that the Workers failed to state a cause of action because they did not allege that "Ohio law compelled PMI to terminate them."

To state a claim under § 1983, plaintiffs "must demonstrate that the defendant deprived them of their 'rights, privileges, or immunities secured by the Constitution' under color of state law.'" *Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 827 (6th Cir. 2007) (quoting § 1983). As a general rule, "[s]ection 1983 does not . . . prohibit the conduct of private parties acting in their individual capacities." *Id.* The "ultimate issue" in determining whether a private party is subject to suit under

§ 1983 is whether "the alleged infringement of federal rights [is] fairly attributable to the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quotation marks omitted). This court applies the three tests articulated by the Supreme Court for determining the existence of state action under § 1983: "(1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test." *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003). Only the second and third tests are relevant to this case.

The state compulsion test requires that "a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (finding no state action even though the state provided a significant portion of the funding of a private corporation, because the state did not appoint board members, select personnel, or make decisions for the organization)). "More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the state responsible for those initiatives." *Id.* at 1335.

There is nothing in the record to show that any of the state entities "exercised such coercive power or provided such encouragement as to make [PMI's] decision state action." *Id*. PMI, a private company, made a business decision to voluntarily enter into a contract with government entities, to close its Dayton Plant, and to terminate the Workers. No state law or any state entity required PMI to take any of those actions. Indeed, the Agreement required only that PMI open a facility in Piqua. It did not require PMI to close facilities elsewhere or lay off existing employees.

The Workers' § 1983 claims also fail under the symbiotic relationship test, which requires a plaintiff to "demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself." *Chapman*, 319 F.3d at 834 (6th Cir. 2003); *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (stating that a challenged activity may be state action "when it is entwined with governmental policies or when government is entwined in [its] management or control") (quotation marks omitted). According to the record, the government entities here did nothing more than authorize and approve a contract that provided tax benefits conditioned on PMI opening a plant in Piqua.

The factual allegations do not suggest that the government showed any interest in the internal business matters of PMI or that, aside from offering tax incentives, it influenced PMI's business decisions. *See Rendell-Baker*, 457 U.S. at 841 (finding no state action where various government regulators "showed relatively little interest in the school's personnel matters"). PMI's challenged actions, moreover, occurred without any involvement whatsoever by any government entity or regulation. *See id.* (holding that there was no state action where "the decisions to discharge the petitioners were not compelled or even influenced by any state regulation"). Nor does the Workers' Amended Complaint allege a nexus between the government and PMI's challenged conduct. For the foregoing reasons, the district court properly dismissed the Workers' § 1983 claims.

## E.        Age-discrimination claims

In their Amended Complaint, the Workers asserted a violation of federal and Ohio age-discrimination laws on the ground that they "were replaced by workers in Piqua who were significantly younger." The district court held that the Workers failed to state a claim because, "although they allege that they were replaced, [they] do not allege facts necessary to support the factual allegation that they were replaced with younger workers." The district court dismissed their age-discrimination claims on that ground.

The Workers base their age-discrimination claims on the allegation that PMI replaced them with employees at the Piqua Plant who were, on average, 18 years younger than the Workers. According to the record, however, PMI did not hire new hourly employees at its Piqua Plant. The company instead filled the hourly positions with individuals who were employed by a temporary employment agency and assigned by that agency to work at the Piqua Plant.

Under both the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623, and Ohio Revised Code § 4112.02, employers are prohibited from, among other things, discharging any individual or otherwise discriminating against any individual with respect to the person's compensation, terms, conditions, or privileges of employment because of that individual's age. The *McDonnell Douglas/Burdine* evidentiary framework that is applied to ADEA claims is also used to analyze age-discrimination claims brought under Ohio law. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) ("The *McDonnell Douglas/Burdine* formula is the evidentiary framework applicable not only to claims brought under Title VII, but also to claims under ADEA [and] to claims of discrimination under Ohio state law . . . .") (citations omitted). A plaintiff who brings an age-discrimination claim "must prove that age was a determining factor in the adverse employment action that the employer took against him." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993).

The *McDonnell Douglas* test requires a plaintiff to first establish a prima facie case of age discrimination by showing that the plaintiff (1) was a member of a protected class of persons (i.e., a person age 40 or over), (2) was discharged, (3) was qualified for the position held, and, lastly, (4) was replaced by someone outside of the protected class. *Minadeo*, 398 F.3d at 764. But where the allegations of discrimination arise from a workforce reduction, "the fourth requirement is modified so that the plaintiff must also demonstrate some 'direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Phelps*, 986 F.2d at 1023 (quoting *Barnes v. Gencorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990), *cert. denied*, 498 U.S. 878 (1990)).

PMI laid off all of the hourly employees at its Dayton Plant pursuant to the reduction-in-force provision contained in the CBA. Accordingly, this is a workforce-reduction case under *Phelps* and requires the Workers to offer evidence indicating that PMI singled out the Workers based on their age. PMI terminated 100% of its hourly employees, some of whom were age 40 or over and some of whom were not. The company then used an employment agency to provide temporary workers, some of whom were age 40 or over and some of whom were not, to fill all of the hourly worker positions at the Piqua Plant. These facts alone, without more, do not raise an inference that PMI terminated the Workers because of their age.

Even assuming that this is not a workforce-reduction case, the Workers still failed to allege facts sufficient to create an inference of age-based discrimination. A person is replaced "only when another employee is hired or reassigned to perform the plaintiff's duties." *Barnes*, 896 F.2d at 1465. A plaintiff's allegation that he or she was replaced by someone who was not employed by the plaintiff's employer, but was instead employed by another company with a contract to perform services for the plaintiff's employer, "cannot justify a reasonable inference of anti-age animus" on that basis alone. *Pages-Cahue v. Iberia Lineas Aereas de Espana*, 82 F.3d 533, 539 (1st Cir. 1996) (relying on *Barnes*, 896 F.2d at 1465). The fact that the employer assigned the former employee's work to an independent contractor that decided to employ younger persons to do the plaintiff's work is, without more, insufficient to establish a prima facie case. *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir. 1992). Here, the temporary workers were hired, employed, and assigned to fill the hourly wage positions at the Piqua Plant by a third party, not PMI. The Workers fail to allege any facts suggesting that PMI had a role in choosing the temporary workers who would be assigned to the Piqua Plant or that it requested younger workers from the temporary employment agency.

Based on the foregoing, the Workers failed to allege facts sufficient to create a reasonable inference of age discrimination based on the Piqua Plant's use of the temporary workers provided by the independent agency. The Workers' claims of age discrimination were thus properly dismissed by the district court.

## F.          Breach of the collective bargaining agreement

The Workers' Amended Complaint further alleged that PMI breached the CBA by closing the Dayton Plant, terminating the Workers' employment, and refusing to bargain with the union over those decisions. Based on these allegations, the Workers asserted state-law claims for breach of contract, anticipatory breach, waiver, and estoppel. The district court dismissed these claims on the ground that they were preempted by federal law. On appeal, the Workers argue that the district court should have continued the analysis under federal law by "treating [the] causes of action as claims under § 301 of the Labor Management Relations Act [(LMRA)]," 29 U.S.C. § 185 (providing federal courts with jurisdiction over any contract between an employer and a labor organization). But as the following analysis indicates, these claims are fundamentally meritless, regardless of whether they are analyzed under state or federal law.

### 1.          *Breach of contract*

The Workers assert that PMI breached the CBA when it "terminated . . . the employee Plaintiffs as part of the tax abatement scheme." They fail, however, to identify any provision in the CBA that prohibits PMI from terminating them. In fact, the CBA contains a "reduction-in-force" provision that expressly *permits* PMI to terminate employees covered under the CBA. That provision requires PMI to give employees "three (3) working days notice before layoff if circumstances reasonably allow." In addition, the CBA contains a provision stating that "[t]he management and direction of the Plant and working forces is vested in the Company, except insofar as is expressly abridged by specific provisions of this Contract."

This court has held that "[i]t is clear . . . that neither federal labor law nor ordinary collective bargaining agreements compel an employer to maintain in operation all or any part of its business." *Heheman v. E. W. Scripps Co.*, 661 F.2d 1115, 1122 (6th Cir. 1981); *see also Wimberly v. Clark Controller Co.*, 364 F.2d 225, 228 (6th Cir. 1966) (holding that the plaintiffs failed to state a cause of action under § 301 of the LMRA because, "[a]bsent an express contractual provision, there is no prohibition against [an employer] moving its operations to [another state]"). Here, the CBA allows PMI to terminate union employees at management's discretion as long as the reduction-in-force provisions are followed. The Workers' own allegations show that PMI adhered to the CBA's "reduction in-force" provision when it gave the Workers advance notice of the plant closing. The Workers' argument that this claim should be analyzed under the LMRA as opposed to state law is irrelevant because there is a complete absence of factual allegations to support a claim for breach of contract. In sum, this claim is wholly without merit and the district court did not err in dismissing it.

### 2.          *Anticipatory breach*

The Workers' Amended Complaint also alleges an "anticipatory breach." It claims that "the Defendants intentionally, willfully, and maliciously breached the contract rights of the Plaintiffs," and that the plaintiffs therefore had the right to treat the contract as breached." The basis of this claim appears to be an allegation that PMI refused to bargain or arbitrate with the Workers pursuant to the CBA.

Under the terms of the CBA, however, the arbitration of disputes was voluntary and PMI had no obligation to bargain with the Union over the closure of the Dayton Plant. Nor did the Workers allege any facts suggesting that PMI engaged in any intentional, willful, or malicious conduct that

would give the Workers the right to treat the CBA as breached. Accordingly, the Workers have no grounds for asserting a claim of anticipatory breach, and the district court did not err in dismissing the claim.

### 3.        *Waiver and estoppel*

Finally, the Workers claim that PMI "has, by its unlawful conduct, waived its rights or is estopped to enforce the rights provided under the contract, federal pre-exemption [sic], or the NLRB." This claim is also meritless.

The Workers fail to assert any factual allegations showing that PMI engaged in "unlawful conduct." The only PMI conduct that could arguably be construed as wrongful is the misrepresentation that the company allegedly made to the Ohio authorities regarding its consideration of Kentucky as an alternative site. That alleged misrepresentation, however, was not made to the Union and therefore does not support an allegation of "unlawful conduct." In addition, PMI never attempted to enforce its rights under the CBA; only the Workers have done so. The Workers therefore have no grounds on which to assert that PMI waived any rights under the CBA or that it is estopped from so doing. This claim was properly dismissed.

### G.        **Malicious interference with the right to petition the government**

The Workers' next claim is that PMI maliciously interfered with their constitutional right to petition the government when the company allegedly told Piqua, Miami County, and the state of Ohio that it was considering Kentucky as an alternative location. According to the Workers, PMI had no plans to move to Kentucky when the statement was made. This statement was apparently a lobbying tactic that PMI used to obtain the most favorable tax treatment possible from Piqua.

PMI advances two arguments in defense against the Workers' claims. First, the company argues that the Workers failed to state a claim for malicious interference with the right to petition because the Workers did not allege that they had ever attempted to petition the government. Second, PMI argues that the Workers "cannot satisfy the second element of a malicious interference claim because PMI's efforts to persuade Piqua's City Commission to grant it a tax abatement was [sic] privileged" under the *Noerr-Pennington* doctrine, which is discussed in subsection 2 below.

### 1.        *State tort*

The Ohio Court of Appeals first recognized "the tort of malicious interference with the constitutional right to petition the government for redress of grievances" in *Singer v. Fairborn*, 598 N.E.2d 806, 814 (Ohio Ct. App. 1991). In that case, Howard Singer, a property owner in Fairborn, Ohio, proposed an amendment to a zoning ordinance that affected his property. *Id.* at 808. The city, in consultation with the city planning board, rejected his proposal. *Id.* Singer later learned that two members of the city planning board had misrepresented to both the planning board and to the city council certain facts relating to the proposal. *Id.* He sued the city, claiming that the planning board members "maliciously and/or recklessly made fraudulent representations and omissions with the intent to cause the planning board and city council to rely upon such representations and to deny Singer's proposed amendment." *Id.* at 812. Singer alleged that, as a result, he suffered serious financial damage. *Id.*

In finding for Singer, the court created a new cause of action:

> An action at law should be available to redress the wrong caused to an injured party as a result of such alleged conduct. We hold that the tort of malicious interference with the constitutional right to petition the government for redress of grievances (protected by Section 3, Article I of the Ohio Constitution, and by the First

Amendment to the United States Constitution) occurs when a third party, without a privilege to do so, knowingly and maliciously makes a false statement for the purpose of inducing a public body to act or to fail to act, when the act, or failure to act, adversely affects the injured party.

*Id.* at 813-814. The Ohio Court of Appeals therefore held that Singer had stated a claim against the two planning board members, and denied the defendants' motion for summary judgment.

*Tri-County Concrete Co. v. Huffman-Kirsch*, No. 76866, 2000 Ohio App. LEXIS 4749 (Ohio Ct. App. Oct. 12, 2000), is the only other Ohio case to discuss this tort. In that case, Tri-County Concrete obtained a property-use variance from the city, which allowed the company to expand its concrete plant. *Id.* at \*3. A local resident who opposed the company's expansion wrote a letter to the city that expressed concerns regarding Tri-County Concrete's property-use variance and that contained allegedly false statements about Tri-County Concrete's compliance record. *Id.* at \*5-6. Tri-County Concrete sued the resident based on *Singer*, claiming malicious interference with the right to petition the government. *Id.* at \*13. The court found that Tri-County Concrete had properly stated a claim, but denied its motion for summary judgment because the resident's statements were constitutionally protected expressions of her opinion, and the company had failed to meet its burden of establishing that the resident had made the statements maliciously. *Id.* at \*15.

Like the plaintiff in *Singer*, Tri-County Concrete had in fact submitted a petition to the government. *See Singer*, 598 N.E.2d at 808 (proposing to amend a zoning ordinance); *Tri-County Concrete*, 2000 Ohio App. LEXIS 4749 at \*3 (proposing a property-use variance). And the defendant's challenged conduct in each case was prompted by, and in direct response to, the plaintiff's petition. *See Singer*, 598 N.E.2d at 808 (two planning board members made false statements to the city in response to Singer's proposal); *Tri-County Concrete*, 2000 Ohio App. LEXIS 4749 at \*5-6 (a resident wrote a letter questioning Tri-County Concrete's property-use variance based on accusations that Tri-County Concrete was not compliant with regulations elsewhere).

Although neither the *Singer* opinion nor the *Tri-County Concrete* opinion explicitly states that a plaintiff must actually petition the government in order to state a claim, the district court below recognized that such a requirement is at the heart of this cause of action: "Central to the tort . . . is the idea that a plaintiff has attempted, or planned to attempt, to petition the government for redress of grievances." (citing *Singer*, 598 N.E.2d at 813-14). The district court's holding that a plaintiff must first exercise the right to petition the government is supported not only by the specific facts of *Singer* and *Tri-County Concrete*, but by First Amendment caselaw.

The *Singer* court grounded the tort of malicious interference on the right to petition the government as found in the First Amendment to the U.S. Constitution and Article I, Section 3 of Ohio's Constitution. *See* 598 N.E.2d at 813-14 (citing U.S. Const. amend. I (protecting the right of the people to "petition the Government for a redress of grievances"), and Ohio Const. Art. I, § 3 ("The people have the right to . . . petition the general assembly for the redress of grievances.")). Because the purpose of the tort is to reinforce the First Amendment's protection of the right to petition the government, a review of this court's relevant jurisprudence is appropriate for guidance in resolving this issue.

In this and other circuits, a "cause of action for violation of the Petition Clause is subject to the same analysis applied to a claim arising under the Speech Clause." *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1226 (6th Cir. 1997); *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 390, n.6 (6th Cir. 1999) (citing cases from various federal circuits). The threshold question in a right-to-petition case under the First Amendment caselaw of this and other circuits is therefore "whether the plaintiff's conduct deserves constitutional protection." *Reichert v. Draud*, 701 F.2d

1168, 1170 (6th Cir. 1983). The plain language of the First Amendment makes clear that a "petition" triggers the amendment's protections. *Thaddeus-X*, 175 F.3d at 387 (finding that, just as "'[p]rotected conduct' in the statutory settings is . . . that conduct which the statute defines as protected[,] . . . certain provisions of the Constitution define individual rights with which the government generally cannot interfere—actions taken pursuant to those rights are 'protected' by the Constitution"); *see also Foraker v. Chaffinch*, 2007 WL 2445561 at *4 (3d Cir. Aug. 30, 2007) (explaining that "when one files a 'petition' one is addressing government and asking government to fix what, allegedly, government has broken or has failed in its duty to repair," and that "[f]ormal petitions are defined by their invocation of a formal mechanism of redress" (citing *Connick v. Myers*, 461 U.S. 138, 154 (1983)).

In light of the foregoing, the Workers must show that their conduct deserves protection under the First Amendment's Petition Clause in order to state a claim for malicious interference with that right. They have failed to make such a showing. In short, the Workers did not petition the government and they took no affirmative steps to do so by, for example, participating in some way in the government's consideration of PMI's tax-abatement proposal. Only petitions to the government, not inaction, are protected and provide a basis for liability where a violation of that right has occurred. Accordingly, the Workers' claim fails at the first step of the inquiry under this court's First Amendment caselaw, upon which the tort is based. The district court therefore correctly held that a petition to the government is a prerequisite for stating a claim of malicious interference with the right to petition.

### 2.    Noerr-Pennington *doctrine*

PMI also argues that the Workers' claim fails because PMI's conduct in lobbying Piqua, Miami County, and the state of Ohio for a tax abatement is protected activity under the Petition Clause of the First Amendment. To protect the right to petition, the Supreme Court has established what has become known as the "*Noerr-Pennington* doctrine." The essence of the doctrine, as set forth in the companion cases of *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), is that "parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988); *see also Westmac, Inc. v. Smith*, 797 F.2d 313, 315 (6th Cir. 1986) ("[G]enuine attempts to influence passage or enforcement of laws are immune from antitrust scrutiny, regardless of the anticompetitive purpose behind such attempts.").

Although the *Noerr-Pennington* doctrine was initially recognized in the antitrust field, the federal courts have by analogy applied it to claims brought under both state and federal laws, including common law claims of tortious interference. *See Video Int'l Prod.*, 858 F.2d at 1084 (applying the doctrine to business tort claims, and citing cases); *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992) (extending the doctrine to § 1983 claims). The doctrine is, at bottom, founded upon a concern for the First Amendment right to petition and, therefore, has been applied to claims implicating that right. *See Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889 (10th Cir. 2000) (quoting *Video Int'l Prod.*, 858 F.2d at 1084); *Video Int'l Prod.*, 858 F.2d at 1084 ("There is simply no reason that a common-law tort can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust.") PMI's *Noerr-Pennington* argument might well have merit in light of the cases applying *Noerr-Pennington*'s protection to state common law claims sounding in tortious interference, but we need not decide that issue here because the Workers failed to state such a claim, as explained in the Part II.G.1. above.

### H.    Loss of consortium

The Workers' final claim is for loss of consortium on behalf of the spouses of the terminated hourly employees. Such a claim, however, must be predicated on a tort involving a bodily injury, and the district court properly dismissed the Workers' claim for failure to allege that any bodily injuries were sustained by the terminated employees as a result of the underlying tort claims (namely, a claim of fraud and violations under the WARN Act, which is defined below).

"[A] claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers *bodily injury*." *Bowen v. Kil-Kare, Inc.*, 585 N.E.2d 384, 392 (Ohio 1992) (emphasis added); *see also Blatnik v. Avery Dennison Corp.*, 774 N.E.2d 282, 297 (Ohio Ct. App. 2002) (holding that a "claim for loss of consortium . . . cannot stand because there is no evidence of bodily injury sustained"); *Cunningham v. Hildebrand*, 755 N.E.2d 384, 393 (Ohio Ct. App. 2001) (holding that the trial court properly dismissed the loss-of-consortium claim brought by the plaintiff's wife where it was derived from the plaintiff's emotional distress claim and involved no bodily injury to the plaintiff). Ohio courts have repeatedly held that the term "bodily injury" does not include nonphysical harms. *See Blatnik*, 774 N.E.2d at 296 (citing *Tomlinson v. Skolnik*, 540 N.E.2d 716 (Ohio 1989)); *Bowman v. Holcomb*, 614 N.E.2d 838, 840 (Ohio Ct. App. 1992).

The Workers base their claims of loss of consortium on a claim of fraud and violations of the Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C. § 2102 (requiring, among other things, that employees who are to be terminated as part of a mass layoff or plant closing receive at least 60 days' written notice). But the Workers have not alleged that any of the terminated employees sustained a bodily injury as a result of the alleged fraud or WARN Act violations. The Workers have therefore failed to state a claim for loss of consortium, and the district court properly dismissed that claim.

The Workers' citations to *Paugh v. Hanks*, 451 N.E.2d 759 (Ohio 1983), and *Rigby v. Fallsway Equip. Co.*, 779 N.E.2d 1056 (Ohio Ct. App. 2002), are misplaced and warrant no different result. In *Paugh*, the Ohio Supreme Court recognized for the first time the tort of negligent infliction of emotional distress and remanded the case, including all of the plaintiff's claims, to the trial court for further proceedings in light of its decision. *Paugh*, 451 N.E.2d at 765, 768. The court did not, however, rule on the loss-of-consortium claim; it simply directed the trial court to evaluate that claim, along with *all* of the plaintiff's claims, in light of its decision. *Id.* at 767-68. *Rigby* is also inapposite because, as PMI aptly notes, that "court had no occasion to address the bodily injury requirement because the defendant failed to raise the issue" and, in any event, a nurse testified that the husband, who had sued his employer for intentional infliction of emotional distress, had in fact sustained physical injuries. *See Rigby*, 779 N.E.2d at 1065. Accordingly, the court held that "there exists a primary action to support the claim of loss of consortium." *Id.* at 168.

### III.    CONCLUSION

For the reasons discussed above, we **AFFIRM** the judgment of the district court.