*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0302p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DAVID HOLZEMER; DOWNTOWN BUGGY,
LLC,

　　　　　　　*Plaintiffs-Appellees,*

　　　　*v.*

CITY OF MEMPHIS; COUNTY OF SHELBY;
JEREMY DREWERY,

　　　　　　　*Defendants,*

MONIQUE CAMPBELL,

　　　　　　　*Defendant-Appellant.*

No. 09-5086

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 06-02436—Samuel H. Mays, Jr., District Judge.

Argued: October 15, 2009

Decided and Filed: September 15, 2010

Before: BATCHELDER, Chief Judge; GIBBONS, Circuit Judge; MALONEY, Chief
District Judge.[*]

_____

## COUNSEL

**ARGUED:** Timothy Taylor, GODWIN, MORRIS, LAURENZI & BLOOMFIELD,
P.C., Memphis, Tennessee, for Appellant. Joni K. Roberts, BATEMAN GIBSON,
L.L.C., Memphis, Tennessee, for Appellees. **ON BRIEF:** Timothy Taylor, GODWIN,
MORRIS, LAURENZI & BLOOMFIELD, P.C., Memphis, Tennessee, for Appellant.
Joni K. Roberts, William C. Bateman, Jr., BATEMAN GIBSON, L.L.C., Memphis,
Tennessee, for Appellees.

_____

[*]The Honorable Paul L. Maloney, Chief United States District Judge for the Western District of
Michigan, sitting by designation.

1

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.   Defendant–appellant Monique Campbell appeals the district court's denial of qualified immunity from the plaintiff–appellees' First Amendment retaliation claim.  David Holzemer and Downtown Buggy, LLC, sued Campbell, the City of Memphis, Shelby County, and various other state, county, and city officials under 42 U.S.C. § 1983 for alleged violations of the First, Fourth, Eighth, and Fourteenth amendments, under 42 U.S.C. § 1985 for an alleged conspiracy to deprive both plaintiffs of their civil rights, and under Tennessee tort law. With respect to Campbell, the district court dismissed or granted summary judgement to Campbell on all claims except the § 1983 retaliation claim, for which the district court denied qualified immunity.  For the following reasons, we affirm the district court's determination.

I.

David Holzemer formed Downtown Buggy, LLC, with outside investors in 2003. Downtown Buggy owned a fleet of eleven motorized, three-wheel rickshaws, designed by Holzemer, with which it operated a taxi service for visitors to downtown Memphis. The plaintiffs first applied for a permit to operate their buggy service in March 2003, and, after an inspection of the buggies and a hearing, the City of Memphis Permit Office ("Permit Office") authorized the operation of the buggies.  Downtown Buggy began operations soon thereafter.

Sergeant Monique Campbell is a member of the Memphis Police Department ("MPD") who worked in the Permit Office, where she participated in the decision-making process for granting permits and also played an investigatory and enforcement role.  The plaintiffs allege that Campbell prevented their buggy drivers from having the same privileges and opportunities as other similarly situated transportation vehicles in Memphis.  Most relevantly, Campbell told buggy drivers that they could not pick up or

drop off patrons at the entrance to the Pyramid,[1] which meant that patrons had to walk several blocks to catch a buggy, while other transportation providers could stop directly outside of the Pyramid to collect patrons.

In late 2003 or early 2004, while driving one of his buggies, Holzemer "happened to cross" Memphis City Councilman Ricky Peete. Peete asked Holzemer how business was going, and Holzemer mentioned the restriction on parking at the Pyramid. Peete told Holzemer that he would look into the restriction, and, according to Holzemer, a Lieutenant Knight of the MPD contacted Holzemer soon afterward to tell him that the buggies could pick up and drop off in front of the Pyramid. The plaintiffs allege that Knight's arrangement was short-lived, and that several months later, Campbell again told Downtown Buggy drivers that they could not pick up and drop off at the Pyramid. Campbell claims that she had no knowledge of Holzemer's conversation with Peete and that there is no evidence that Peete contacted the Permit Office or any other official about the restriction. Campbell also asserts that the Permit Office has no authority to make policy regarding transportation at the Pyramid and that all such decisions were made and enforced by the Special Events Unit of the MPD. Holzemer noted that Campbell had told Downtown Buggy that it could not drive along the Main Street Mall, but that issue had been resolved after he had contacted the Center City Commission. Holzemer also stated that, in general, "[w]hen we had problems, we would talk to the heads of the city council. . . . We would go and we would talk to the people that ran the city and let them know exactly what was going on." At one point, according to Holzemer, Kevin Kane, head of the Convention and Visitors Bureau, provided Holzemer with a letter saying that Downtown Buggy was doing a great job and told him to take it to the Permit Office.

Downtown Buggy successfully renewed its permit in March 2004. Some time afterward, following notification from the State of Tennessee that buggies constituted off-road vehicles and did not require license plates, the plaintiffs returned their license

---

[1]The Pyramid Arena was Memphis's busiest event venue and the home of the National Basketball Association's Memphis Grizzlies and the University of Memphis Tigers basketball teams until late 2004, when the FedEx Forum opened.

plates to the State and operated without plates until March 2005. At that time, Campbell and her supervisor at the Permit Office, Lilli Jackson, denied renewal of Downtown Buggy's permits on the ground that the buggies lacked license plates. Despite receiving evidence of the State's notification, Campbell and Jackson insisted that the buggies be licensed. Downtown Buggy subsequently obtained new license plates.

At a meeting on April 6, 2005, the Permit Office refused to issue a permit despite the new licenses. Holzemer, accompanied by an attorney and other associates, met with the Permit Office again the following day and received a permit several days later. As a result of the delayed permit process, Downtown Buggy was unable to operate for two weeks. Furthermore, the plaintiffs allege that MPD officers then began to harass their drivers. Campbell also allegedly informed Downtown Buggy that it would no longer be able to service patrons at the FedEx Forum, which had replaced the Pyramid as Memphis's premier event venue.

On the morning of July 14, 2005, Downtown Buggy's premises were raided by the Auto/Cargo Task Force ("Task Force"), which is made up of Federal Bureau of Investigation and National Insurance Crime Bureau agents working with local county and city law enforcement. The Task Force followed an anonymous tip alleging that Downtown Buggy was altering serial numbers on the buggies to avoid getting permits for additional buggies. Holzemer signed a consent to search the premises, allegedly under duress. While Task Force members were confiscating the buggies, searching the property, and frisking and detaining Holzemer, Campbell arrived at Downtown Buggy to verify the buggies' vehicle identification numbers following the Task Force's discovery of one buggy with mis-matching numbers. The plaintiffs contend that Campbell searched Downtown Buggy's belongings without a warrant or probable case and "jeered at" Holzemer, telling him "he did this to himself." Campbell stipulated, for the purposes of summary judgment, to telling him: "I told you that you were going to do this to yourself" and, "[a]s of this moment, you are officially shut down." Holzemer was taken to a police station and questioned for approximately three hours. Following the confiscation of the buggies, Holzemer alleges that the MPD rebuffed all attempts by him

or his parents to provide documentation and secure the return of the buggies and disallowed the use of any interim replacement buggies.

In October 2005, Holzemer discovered that warrants for his arrest had been issued, turned himself into the MPD, and retained an attorney. All charges were dismissed in November 2005 after a General Sessions Judge found that Tennessee Code § 55-5-112 (fraudulently defacing, destroying, or altering motor vehicle numbers) does not apply to bicycle buggies. Soon thereafter, Holzemer went to the Permit Office to reinstate the permits and to recover the buggies. Campbell referred Holzemer to Jackson, who informed him that she could not issue permits without vehicles and referred him to "Auto Cargo," which in turn referred him to the impound lot. On recovering the buggies, Holzemer discovered that they had sustained severe damage and were unusable; he sold them for scrap.

Between December 2005 and February 2006, Holzemer met twice with Campbell to try to secure permits for Downtown Buggy. Campbell first told him that he could not have permits because he had no vehicles. Holzemer offered to buy new buggies, but only if he received assurances that permits would be forthcoming. Subsequently, the Permit Office informed him on two occasions that to receive a new permit, he would have to reapply and provide proof that the felony charges had been dropped. In April 2006, Holzemer provided such proof to the Permit Office, which notified the City Attorney. Holzemer alleged that when he went to the City Attorney's Office, they had never received the fax from the Permit Office requesting confirmation of the dropped charges. Despite inquiring by letter and in person with the City Attorney, Holzemer heard nothing regarding the reinstatement of the permits. He returned to the Permit Office in January 2007 and March 2007, but Campbell repeatedly refused to speak with him.

Holzemer and Downtown Buggy filed a complaint in federal district court on July 12, 2006, against the State of Tennessee, Shelby County, the City of Memphis, and various public officials, including MPD officers, county sheriff's deputies, and other city employees in their individual capacities. The plaintiffs filed an amended complaint on

October 26, 2006, in which they first alleged the instant claim of First Amendment retaliation. The plaintiffs brought claims under 42 U.S.C. §§ 1981, 1983, 1985, and 1988, alleging violations of their rights under the First, Fourth, Eighth, and Fourteenth amendments. The plaintiffs also brought a number of state law claims.

The defendants filed motions to dismiss, all of which the district court addressed in an order entered September 25, 2007. The district court found that the statute of limitations barred consideration of any alleged constitutional violations prior to July 12, 2005, and, therefore, dismissed all claims against the defendants arising from events before that date. Only two claims against Campbell survived her motion to dismiss, namely the plaintiffs' § 1983 claim alleging retaliation for actions protected by the First Amendment's Petition Clause and a state tort claim for intentional infliction of emotional distress ("IIED").

On December 31, 2008, the district court entered an order on the four remaining defendants' motions for summary judgment. *See Holzemer v. City of Memphis*, No. 06-2436, at 74–76 (W.D. Tenn. Dec. 31, 2008) [hereinafter Slip Op.]. The district court granted summary judgment to Officer Drewery, the City of Memphis, and Shelby County. With respect to Campbell's motion, the district court granted summary judgment on the IIED claim but denied summary judgment and qualified immunity from the retaliation claim. Campbell timely appealed.

## II.

The only issue on appeal is whether Campbell is entitled to qualified immunity from the plaintiffs' claim of First Amendment retaliation. The claim derives from Holzemer's conversation with Memphis City Councilman Ricky Peete, during which they discussed Downtown Buggy's troubles with parking. The plaintiffs argue that this conversation constituted protected speech under the First Amendment's Petition Clause, which protects the right to "petition the Government for a redress of grievances." U.S. Const. amend. I. They further allege that Campbell's actions frustrating Downtown Buggy's operation and preventing permit renewals were in retaliation for their petitioning activity. Campbell asserts on appeal that Holzemer's casual, spontaneous

conversation with Peete was not protected petitioning activity and, therefore, no constitutional violation occurred. She further argues that if the conversation were protected petitioning, she would be entitled to qualified immunity because that right was not clearly established.

"Government officials who perform discretionary functions are generally protected from liability for civil damages as long as their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sallier v. Brooks*, 343 F.3d 868, 878 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Because such a decision involves solely a question of law, we review the district court's denial of qualified immunity *de novo*. *Siggers-El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005).

We have developed a three-step analysis for reviewing district court decisions on qualified immunity. *See Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Id.* (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*)). Although we are not bound to follow the sequence of this inquiry, *see Pearson v. Callahan*, 129 S. Ct. 808, 813 (2009), we believe that this case would benefit from the traditional sequence outlined in *Saucier v. Katz*, 533 U.S. 194 (2001), and *Feathers*. Because of the nature of the constitutional right at issue, "there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong" because it would be "difficult to decide whether a right is clearly established without deciding precisely what the constitutional right happens to be." *Pearson*, 129 S. Ct. at 818 (quoting *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 2005)). Therefore, we first address whether Holzemer's conversation with Peete constitutes

constitutionally protected petitioning, and, finding that it is, we then examine whether that right was clearly established at the time the events took place. In conducting our review, we view the facts in the light most favorable to the plaintiffs. *Siggers-El*, 412 F.3d at 699.

> The district court found:

> A reasonable city official would know that shutting down or threatening to shut down a person's private business in retaliation for that person's seeking redress with the City government would violate that person's constitutional right to petition the government. No city official "could, as a matter of law, reasonably have believed that [such action] was lawful."

Slip Op. at 26 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Campbell, however, contends that Holzemer's conversation with Peete was not protected petitioning activity under the First Amendment and that the record demonstrates that she was merely "doing her job" because she did not reissue permits to an individual who was ineligible for them. We find that requesting assistance from a city councilman—whether in writing or in person—constitutes petitioning activity entitled to the protection of the Petition Clause of the First Amendment. Consequently, Holzemer and Downtown Buggy have a right to be free from retaliation for exercising that right. Because we find no constitutional distinction between an oral and written petition for redress, we also find that a reasonable city official would have known that retaliation for seeking such assistance from a local, elected official is unlawful.

## A.

In order to affirm the district court's denial of qualified immunity, we must find that, "[t]aken in the light most favorable to [the plaintiffs], . . . the facts alleged show [Campbell's] conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. We have recognized that "government retaliation for filing a petition violates the literal language of the Petition Clause." *Gable v. Lewis*, 201 F.3d 769, 772 (6th Cir. 2000). We have also clearly stated that private citizens have a First Amendment right to criticize public officials and to be free from retaliation for doing so. *Zilich v. Longo*, 34

F.3d 359 (6th Cir. 1994) (finding a violation of the First Amendment for retaliation by a mayor against an individual who had publicly criticized the mayor).  However, the plaintiffs' protected activity falls somewhere between these two long-accepted principles—that is, plaintiffs specifically allege that Campbell violated the plaintiffs' right to be free from retaliation for the exercise of their right to petition the government for redress via Holzemer's conversation with Peete.[2]  Thus, our review is limited to this smaller subsection of the First Amendment right.

We have held that a plaintiff alleging First Amendment retaliation "must prove that 1) he engaged in protected conduct, 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct, and 3) the adverse action was taken at least in part because of the exercise of the protected conduct." *Siggers-El*, 412 F.3d at 699 (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999) (*en banc*)).  This inquiry is intensely context-driven: "Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting—whether activity is 'protected' or an action is 'adverse' will depend on context." *Thaddeus-X*, 175 F.3d at 388.  The district court found that Holzemer's request of Peete constituted protected petitioning activity; that there was sufficient evidence in the record to lead a reasonable jury to conclude that Campbell knew of Holzemer's conversation with Peete and frustrated his business activities because of it; and that a reasonable jury could find that Campbell's dilatory tactics with respect to reissuing permits and her strong statements at the July 2005 raid of Downtown Buggy's premises amounted to adverse acts that would deter a person of ordinary firmness from engaging in the protected petitioning activity.  Slip Op. at 18–26.  Campbell disputes all of these determinations.

---

[2]It should be noted that Holzemer's conversation with Peete was not the only potential petitioning activity in which Holzemer engaged.  The plaintiffs produced evidence that Holzemer spoke with other city officials about the parking problems.  Holzemer and an associate, Brian Reed, also contacted the Tennessee Department of Public Safety ("DPS") in Nashville to help resolve a dispute with Campbell regarding whether the buggies needed to have license plates.

1.

We begin by determining whether Holzemer's request for assistance constitutes petitioning activity protected by the Petition Clause. *See Campbell v. PMI Food Equip. Group*, 509 F.3d 776, 789 (6th Cir. 2007) ("The threshold question in a right-to-petition case under the First Amendment caselaw of this and other circuits is . . . 'whether the plaintiff's conduct deserves constitutional protection.'" (quoting *Reichert v. Draud*, 701 F.2d 1168, 1170 (6th Cir. 1983))).

"The plain language of the First Amendment makes clear that a 'petition' triggers the amendment's protections. *Campbell*, 509 F.3d at 789 (citation omitted). The Petition Clause protects petitioning of "all departments of the Government," and a private citizen's business interest can be the subject of a constitutionally protected petition. *Gable*, 201 F.3d at 771; *see also E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.* (*Noerr*), 365 U.S. 127, 139 (1961) ("A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would . . . deprive the people of their right to petition in the very instances in which that right may be of the most importance to them.").

Admittedly, the context in this case—a private businessman attempting to operate his business within the permit and policy landscape of local government—is one that we rarely encounter. *See Thaddeus-X*, 175 F.3d at 390 & n.6. In the relatively few cases in which we have addressed Petition Clause retaliation claims, the plaintiffs' petitions generally have triggered some formal mechanism of redress such as a grievance process or lawsuit, while our cases addressing formal and informal verbal complaints traditionally have come before us as Free Speech Clause cases. For example, in *Thaddeus-X*, we found that a prisoner who filed grievances against prison officials exercised his right to petition. *Id.* at 395–96 & n.10. And, in *Gable*, the protected petitioning activity was an "official written complaint" of sex discrimination lodged with a state agency. 201 F.3d at 770. The Supreme Court has found informal letters to the President, a protest including placards and singing, and a publicity campaign "ostensibly directed toward influencing government action" to constitute protected petitioning

activity. *See McDonald*, 472 U.S. at 485; *Noerr*, 365 U.S. at 144; *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965) (finding that the Petition Clause protects "a concerted effort to influence public officials"); *Edwards v. South Carolina*, 372 U.S. 229 (1963) (finding a protest against laws promoting racial discrimination in the State of South Carolina to be protected petitioning activity).

Only two circuits have specifically addressed informal, oral petitions. In *Pearson v. Welborn*, 471 F.3d 732 (7th Cir. 2006), the Seventh Circuit addressed the issue of oral petitions in the prison context. The *Pearson* court reasoned:

> We are . . . unconvinced that the form of expression—i.e., written or oral—dictates whether constitutional protection attaches. [The defendant] acknowledges that a prison grievance is protected . . . and even goes so far as to admit that Pearson's complaints would likely have been protected if he had reduced them to writing on an official grievance form. But we decline to hold that legitimate complaints lose their protected status simply because they are spoken. *Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form.*

*Id.* at 741 (emphasis added); *accord Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007); *Palermo v. Coos County Dep't of Corr.*, No. 08-cv-109-JL, 2008 WL 4200102, at *5 (D.N.H. Sept. 11, 2008). The plaintiffs argue that *Pearson* should control this case for similar reasons. It is clear that had Holzemer "reduced" his complaint to writing and submitted it to Peete's office or to the city council at large, his request would have been a protected petition for redress. *See McDonald*, 472 U.S. at 485 (addressing two letters to the President as petitions). Furthermore, the plaintiffs allege that Holzemer received a call from an MPD officer removing the ban on parking near the Pyramid shortly after his discussion with Peete. Thus, if these facts are true, it appears that Peete treated the request as a petition. Moreover, this kind of informal petitioning is consistent with the Supreme Court's jurisprudence on lobbying and protesting as protected petitioning activity. *See Pennington*, 381 U.S. at 670; *Noerr*, 365 U.S. at 138; *Edwards*, 372 U.S. at 235–36. Holzemer's request of Peete is merely lobbying on the local level. Holzemer stated, "When we had problems, we would talk to the heads of the city council. . . . We

would go and we would talk to the people that ran the city and let them know exactly what was going on."

The Third Circuit has considered oral petitions in the public-employment context. *See Foraker v. Chaffinch*, 501 F.3d 231 (3d Cir. 2007); *San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir. 1994). The *San Filippo* court distinguished between informal and formal petitions and concluded that "communications that are not petitions" should be addressed under the Free Speech retaliation case law of *Connick v. Myers*, 461 U.S. 138 (1983). The court stated:

> [N]either the United States nor the several states are required to recognize as a "petition" whatever particular communication is so characterized by one who chooses to protest governmental acts or omissions. But when government—federal or state—formally adopts a mechanism for redress of those grievances for which government is allegedly accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious "petition" invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur.

*San Filippo*, 30 F.3d at 442. In a subsequent case, the Third Circuit stated that "[f]ormal petitions are defined by their invocation of a formal mechanism of redress." *Foraker*, 501 F.3d at 236. The *Foraker* court also implied in *dicta* that informal petitions do not enjoy the same degree of the Petition Clause's protection as formal petitions. *See id.* at 237–38.

Campbell argues that *San Filippo* and *Foraker* stand for the principle that a "petition" must invoke some formal grievance mechanism. We disagree. While the *San Filippo* court holds that once a government entity recognizes a communication as a petition, it is bound to treat it as such, it does not hold the reverse to be law. *San Filippo* stands for the unsurprising proposition that once formal mechanisms have been employed, they enjoy Petition Clause protection. Moreover, in distinguishing between informal/Free Speech and formal grievances/Petition Clause claims, the Third Circuit relied upon purpose and audience: "[W]hen one files a 'petition' one is not appealing

over government's head to the general citizenry: When one files a 'petition' one is *addressing government* and *asking government to fix* what, allegedly, government has broken or has failed in its duty to repair." *San Filippo*, 30 F.3d at 442 (emphasis added); *accord Foraker*, 501 F.3d at 237 ("Whereas the Free Speech Clause protects the right to wide-open debate, the Petition Clause encompasses only activity to a government audience.  This distinction correlates to the separate analysis for each clause.").  Within this framework, Holzemer's request to Peete falls squarely under the protections of the Petition Clause.  Holzemer's request was aimed directly at a city councilman and involved no public complaint or statement.  Holzemer sought solely assistance in removing the impediments, apparently put in place by the MPD and Permit Office, to conducting his business.  According to Holzemer, shortly after he lodged his informal request with Peete, an officer called him to inform him that Downtown Buggy was authorized to access the Pyramid.  That is, as alleged, the repair followed the request for a fix.  Moreover, the informal nature of Holzemer's petition and the apparent solution is not inconsistent with the informal interactions of local businessmen and local governments.  Thus, even under *San Filippo* and *Foraker*, Holzemer's request for assistance from Peete falls within the meaning and purpose of the Petition Clause.

Furthermore, *San Filippo* and *Foraker* restricted their holdings to the public employment context, in which restrictions on First Amendment retaliation claims have been much more limited due to the government's unique role as employer.  *See id.*; *see also Waters v. Churchill*, 511 U.S. 661, 674 (1994) ("[C]onstitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign . . . because the speech interferes with the government's operation.  Speech by private people can do the same, but this does not allow the government to suppress it.").  In *Foraker*, the court expressed concern about turning all internal informal complaints to supervisors into constitutionally protected speech and found the *Foraker* petition unprotected because the employee–petitioner had informally complained to his supervisor *as his employer* rather than "*as a governmental agency*."  501 F.3d at 247 (emphasis added).  In the context of petitioning by a private citizen like Holzemer, this informal up-the-chain-of-command

concern is absent and, thus, the formal-grievance requirement is unnecessary. *See Gable*, 201 F.3d at 771 ("Since the reason for the ["public concern"] test is missing in the present [non-employment] case . . . the test should not be applied here.").

In arguing that the law of this court requires a petition to trigger a formal mechanism for grievances, Campbell also relies heavily upon a recent case of ours that cited *Foraker* in addressing Ohio's tort of malicious interference with the right to petition the government. *See Campbell*, 509 F.3d at 776. Although *Campbell* cited *Foraker*'s discussion of formal mechanisms of redress, the opinion did not outline the scope of the Petition Clause in this circuit because the plaintiffs in that case "did not petition the government and they took no affirmative steps to do so." *Id.* at 789–90. As the district court in the instant case observed, the *Campbell* court merely found that "inaction by the plaintiffs could not be protected action and could not be construed as a petition to the government." Slip Op. at 18. Thus we have never held that an individual must trigger a formal mechanism for filing a grievance in order to enjoy the protections of the First Amendment's Petition Clause and we decline to do so today. We hold that Holzemer's request for government assistance was protected petitioning activity.

Because his petitioning fell under the protections of the First Amendment, Holzemer and Downtown Buggy have a right to be free from retaliation for engaging in that protected activity: "[R]etaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment." *Zilich*, 34 F.3d at 364 (citation omitted); *see also Smith v. Ark. State Highway Employees Local 1315*, 441 U.S. 463, 465 (1979) (*per curiam*) (noting that public employees "surely can . . . petition openly, and [be] protected by the First Amendment from retaliation for doing so."). Therefore the plaintiffs' allegations of retaliation, if proven, would constitute a violation of the plaintiffs' constitutional rights.

2.

We must next consider whether Campbell "took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct." *Siggers-El*, 412 F.3d at 699 (citing *Thaddeus-X*, 175 F.3d at 393). "Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). Our First Amendment retaliation cases demonstrate that the harassment necessary to rise to a level sufficient to deter an individual is not extreme. *See Siggers-El*, 412 F.3d at 701 ("[S]ince there is no justification for harassing people for exercising their constitutional rights, [the deterrent effect] need not be great in order to be actionable." (citations omitted)). We have held that the adverse-action requirement "is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Thaddeus-X*, 175 F.3d at 398. Therefore, "if a reasonable trier of fact could conclude that a retaliatory act would deter a person from exercising his rights, then the act may not be dismissed at the summary judgment stage." *Siggers-El*, 412 F.3d at 701 (citation omitted).

The plaintiffs point to three adverse actions taken by Campbell: 1) the statements Campbell made during the raid; 2) Campbell's purposeful delay in granting permit renewals; and 3) Campbell's withholding of exculpatory evidence from the prosecution of Holzemer for vehicle registration violations. Campbell disputes the district court's finding that any of her actions were adverse and argues that the effective closure of Downtown Buggy's operations was caused by actions over which she had no control and in which she did not participate. She argues that it was the felony charges and the confiscation and subsequent destruction of the buggies that rendered Downtown Buggy ineligible for permit renewal. However, we find that, viewing the conflicting facts in the light most favorable to the plaintiffs, there is sufficient evidence to permit a reasonable trier of fact to find that Campbell engaged in delay tactics and hostility toward the plaintiffs and that Campbell's actions could deter a person of ordinary firmness from further exercising his right to petition local government officials.

According to Holzemer's business associate, Brian Reed, Campbell had a conversation with Reed and Holzemer in her office in 2005 during which she told them not to talk to other people in the Permit Office and that she did not care what the state or city council said because she was "like [their] mama" and was the one who made decisions. Reed stated that the permits were only issued after a third meeting with Campbell, this time with an attorney present, and that Campbell's supervisor had issued the permits on that occasion over Campbell's recommendation not to do so. Reed also alleged that, on one visit, Campbell said, "Don't say anything else to me, or I am going to slam you on the floor, handcuff you, and take your (expletive) upstairs kicking and screaming. The best thing for you to do is leave this office and don't say anything else to me." Additionally, Holzemer claims that, after the criminal charges against him were dismissed in late November 2005, "[e]very time [Downtown Buggy] went to talk to Sergeant Campbell . . . she would throw her hands up in the air and make these ridiculous sounds, like ahe, ahe, ahe, and you couldn't talk to her." Such behavior might deter citizens from petitioning city council if petitioning would lead to a failure to obtain necessary renewal permits and the *de facto* closure of their business. Finally, Campbell's statements during the raid—"as of this point you're officially shut down" and "I told you you would do it to yourself"—were sufficiently hostile, as alleged, to act as a deterrent to further petitioning.

Campbell argues that there was no adverse action because the plaintiffs were not actually deterred from seeking redress. That the plaintiffs themselves were not deterred, without more, is not sufficient to prove a lack of adverse action. We have previously stated that "the issue is whether a person of ordinary firmness would be deterred, not whether the [plaintiff] himself actually was deterred." *Harris*, 513 F.3d at 519 (citation omitted). Campbell further submits that no adverse action could have been taken because Holzemer was not entitled to a permit renewal and so could suffer no constitutional deprivation by not receiving one. This argument also fails. Although Campbell is correct that Holzemer had no constitutional property interest in the permit because it was a benefit within the city's discretion to grant or deny, *see BPNC, Inc. v.*

*Taft*, 147 F. App'x 525, 530 (6th Cir. 2005), there are constitutional limitations to that discretion:

> [The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.

*Rutan v. Republican Party*, 497 U.S. 62, 72 (1990) (citation omitted). It is for the trier of fact to determine whether Campbell withheld the government benefit of permit renewal based on proper or improper grounds or in any way acted to frustrate the plaintiffs' right to petition the government. We therefore find that, for the purposes of withstanding the motion for summary judgment, the second element of the retaliation claim satisfied.

3.

We now consider whether the alleged adverse action "was taken at least in part because of the exercise of the protected conduct." *Siggers-El*, 412 F.3d at 699 (citation omitted). We have noted that a "'motivating factor' . . . is one without which the action being challenged simply would not have been taken." *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002). The question, then, is whether the plaintiffs presented sufficient evidence to establish an inference that Holzemer's request of Peete was a "motivating factor" in Campbell's alleged harassment and dilatory actions. The district court found that, "[r]eading all facts and drawing all inferences in the light most favorable to Plaintiffs, a reasonable juror could infer from the chronology of events that Campbell knew about and was motivated by Holzemer's conversation with Councilman Peete." Slip Op. at 25. Campbell contends that this inference is too attenuated.

"[P]roof of an official's retaliatory intent rarely will be supported by direct evidence of such intent. . . . Accordingly, claims involving proof of a [defendant's] intent seldom lend themselves to summary disposition." *Bloch*, 156 F.3d at 682 (quotation marks omitted). Consequently, circumstantial evidence may provide

sufficient evidence of retaliatory intent to survive summary judgment. *See Harris*, 513 F.3d at 519–20. The plaintiffs argue that temporal proximity provides the necessary circumstantial evidence. "In analyzing the facts in temporal proximity cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). We have found that "the temporal proximity between . . . filing . . . grievances and the [adverse action] provides some circumstantial support for a causal connection" but have been reluctant to find that such evidence without more can demonstrate "that the filing of grievances was a substantial or motivating factor." *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001). More recently, in the employment context, we summarized our case law on the weight given to temporal proximity in First Amendment retaliation cases "as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference." *Vereecke*, 609 F.3d at 401.

We find that the plaintiffs produced evidence that, if true, creates an inference that Campbell's hostility and obfuscatory actions toward the plaintiffs arose from Holzemer's decision to bypass the Permit Office and Campbell by going to Peete and other city officials. While temporal proximity is key circumstantial evidence in this case, it is not the only evidence presented by the plaintiffs to support this inference. A rational jury could infer that Campbell's actions constituted retaliation from a combination of the chronological events between 2003 and 2007—*e.g.*, denying, granting, and again denying access to the Pyramid and, later, the FedEx Forum—and Campbell's alleged statements to Holzemer and Reed during the raid and in Downtown Buggy's interactions with the Permit Office regarding permit renewals.

Campbell argues that she never had knowledge of Holzemer's conversation with Peete, and, therefore, it could not have been a motivating factor for any actions she allegedly took against the plaintiffs. The plaintiffs, however, presented evidence that, if true, demonstrates that Campbell was aware that Holzemer and Downtown Buggy had

sought the help of other public officials and was displeased that Holzemer had gone over her head. For example, Reed stated that Campbell warned Downtown Buggy not to contact other city officials about the permit renewal. Additionally, Holzemer continued to contact city officials throughout 2004 and 2005, after his initial conversation with Peete. At one point, Holzemer allegedly received a letter from a city leader commending Downtown Buggy's services to the community and was instructed to take the letter to the Permit Office. While these incidents do not demonstrate that Campbell knew of Holzemer's request of Peete specifically, they do suggest that the Permit Office—and, therefore, Campbell—knew of Holzemer's petitioning activity. Moreover, soon after Holzemer spoke with Peete, Downtown Buggy received permission to operate near the Pyramid. Neither Campbell nor the Permit Office interfered with this arrangement until several months later, when Downtown Buggy was again denied access to profitable downtown locations.

Finally, Campbell argues that she had multiple grounds upon which to deny the plaintiffs a permit based on city ordinances and that these grounds prove that the adverse act of non-renewal would have occurred regardless of any alleged retaliation. The record before us, however, is devoid of any evidence that Campbell actually relied on any of those other, alleged grounds. The issue in a First Amendment retaliation claim is the grounds actually relied upon, not those that might have been relied upon by some other government agent in a similar situation, and plaintiffs need only show that the action was taken "at least in part because of the exercise of the protected conduct." *Siggers-El*, 412 F.3d at 699. Furthermore, even assuming that the record contained some evidenc that non-renewal of the plaintiffs' permit was based solely on their alleged retaliatory actions, such as her involvement in the July raid, the threats alleged in Reed's affidavit, or the refusal to help facilitate permit renewal after November 2005, when all felony charges against Holzemer had been dropped.

In summary, we find that Holzemer's request for help from a city councilman regarding difficulties that he was having operating his business constitutes a "petition" for the purposes of the First Amendment's Petition Clause. We find no distinction

between oral and written grievance when what was requested orally would clearly constitute a petition if reduced to writing. Additionally, we find that the plaintiffs produced evidence sufficient, if true, to support a claim of retaliation for exercising that right to petition.

## B.

Having found a constitutional violation, we must next determine whether that right was clearly established at the time of the violation, *Pearson*, 129 S. Ct. at 818, and whether the defendant acted objectively unreasonably "in light of the clearly established constitutional rights," *Feathers*, 319 F.3d at 848 (citation omitted). "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (citation and internal quotation marks omitted). "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002) (citation omitted). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (quoting *Anderson*, 483 U.S. at 640). A public official could "still be on notice that [his] conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). We must determine, therefore, whether a reasonable city official could have believed that retaliating against a local businessman because he sought the help of a local elected official "was lawful, in light of clearly established law and the information the [official] possessed." *See Wilson*, 526 U.S. at 615.

We find that the case law of this court and of the Supreme Court demonstrates that the right to petition a local, elected representative for assistance in dealing with local government agencies was clearly established at the time that the relevant events took place and that a reasonable local official would have known that retaliating against a

citizen exercising that right is unlawful.  Moreover, a reasonable city official would have known that the Constitution prohibits retaliation for a citizen's exercise of his First Amendment right to Free Speech, whether that speech takes written, oral, or another form.  *See, e.g.*, *Jenkins*, 513 F.3d at 588 ("[T]he right to criticize public officials is clearly protected by the First Amendment."); *see also Thomas v. Collins*, 323 U.S. 516, 530 (1945) ("It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances.  All these, though not identical, are inseparable.").  Therefore, Campbell should have known that Holzemer's underlying conversation with Peete—whether it is categorized as protected petitioning or as free speech activity—was an exercise of his First Amendment rights, and, therefore, any retaliation against him for the exercise of those rights would constitute a constitutional violation.

In seeking help from a city councilman, Holzemer's petitioning activity reflects the very origins of the Petition Clause.  *See Noerr*, 365 U.S. at 137 ("In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives."); *see also Gable*, 201 F.3d at 770–71 ("[H]istorically the right of 'petition' was confined to seeking legislative or judicial relief." (citation omitted)).  In *Gable*, we found that the Supreme Court has recognized the broader scope of the Petition Clause by "clearly establish[ing] that the submission of complaints and criticisms to nonlegislative and nonjudicial public agencies like a police department constitutes petitioning activity protected by the petition clause."  201 F.3d at 771.  We have also determined that, unlike in the public employment context, there is no "public concern" requirement for private citizens who petition their government.  *Id.* at 772.  Thus, Campbell should have known that any "submission of complaints or criticisms" to either the Permit Office or to a city councilman in furtherance of a private business interest constitutes constitutionally protected petitioning activity.

Similarly, our case law clearly establishes that Campbell was on notice that retaliation for any petitioning activity is unlawful. *Id.* ("[G]overnment retaliation for filing a petition violates the literal language of the Petition Clause."); *see also Zilich*, 34 F.3d at 365 ("The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional, and 'retaliation claims have been asserted in various factual scenarios." (citations omitted)).

Our case law thus demonstrates that the right to petition a local legislative representative for assistance with economic interests was clearly established when Holzemer spoke to Peete about Downtown Buggy's problems. We agree with the Seventh Circuit that "[n]othing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form." *Pearson*, 471 F.3d 741. We therefore likewise "decline to hold that legitimate complaints lose their protected status simply because they are spoken" or "that the form of expression—i.e., written or oral—dictates whether constitutional protection attaches." *Id.*

The Supreme Court has interpreted the Petition Clause to encompass more than a written petition. In *Edwards v. South Carolina*, the Supreme Court found that a peaceable demonstration that included holding placards and singing triggered the First Amendment's Free Speech, Petition, and Association clauses. 372 U.S. at 235–36. The Court characterized the petitioning activity as "peaceably express[ing] their grievances to the citizens of South Carolina, along with the Legislative Bodies of South Carolina." *Id.* at 235 (internal quotation marks omitted). Like Holzemer, the *Edwards* petitioners did not trigger a formal grievance mechanism, nor did they submit a formal written complaint. Nevertheless, they successfully expressed their dissatisfaction with South Carolina's discriminatory laws to the government of South Carolina by placard and by spoken word.

Similarly, Holzemer's petitioning activity is nothing more or less than the local equivalent of lobbying activity that the Supreme Court has repeatedly affirmed as constitutionally protected petitioning activity. In a series of antitrust cases, the Supreme

Court held that lobbying and publicity campaigns by industry groups constitutes protected petitioning activity. *See Cal. Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 510–11 (1972) (affirming *Noerr* and *Pennington*); *Pennington*, 381 U.S. at 670 (finding that the Petition Clause protects "a concerted effort to influence public officials"); *Noerr*, 365 U.S. at 138 (finding a publicity campaign to influence government constitutes protected petitioning). The *Noerr* Court found that the "mere solicitation of government action with respect to the passage and enforcement of laws" was petitioning activity not subject to the restrictions of the Sherman Act unless that petitioning was a sham. *Id.* Requesting help from a city councilman in the enforcement of local permit regulations is the equivalent in the local government context. *See also Pearson*, 471 F.3d at 741 ("[I]t is possible that J-pod prisoners eschewed the formal grievance process precisely because prison staff welcomed direct complaints. To then hold that those staff have a free pass to retaliate on the basis of such complaints—which would be protected if reduced to writing—makes no sense.").

Therefore, "[n]o reasonable official could possibly believe that it is constitutionally permissible to retaliate" against a private citizen by frustrating the operation of his business simply because he sought help from his locally elected representative. *See id.* And, no reasonable officer could believe that retaliation for the exercise of a First Amendment right is permitted when that exercise takes the form of speech but is not permitted when the same expression is written. Moreover, even though we have not previously acknowledged the lack of distinction between oral and written petitions in interpreting the scope of the Petitions Clause, the plaintiffs allege a violation of clearly established First Amendment rights under the Free Speech Clause. *See Zilich*, 34 F.3d at 365 ("The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional." (citations omitted)). Therefore, Campbell cannot avail herself of the excuse that just speaking with a public official is not constitutionally protected petitioning activity. Holzemer's underlying conduct—speech—is protected regardless of whether it is categorized as a formal petition or a citizen's free speech. Consequently, officers of reasonable competence in

Campbell's shoes would have known that her actions, if as alleged, were unlawful retaliation, and we find that Campbell is not entitled to qualified immunity.

III.

For the foregoing reasons, we affirm the district court's denial of qualified immunity.