NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0288n.06

No. 18-2156

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KEVIN CAMPBELL,

      Plaintiff-Appellee,

v.

DANIEL MACK, et al.,

      Defendant-Appellant.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

BEFORE:     GUY, CLAY, and GRIFFIN, Circuit Judges.

**CLAY, Circuit Judge.** Defendant Daniel Mack moved for summary judgment with respect to Defendant's alleged violations of Plaintiff Kevin Campbell's First and Fourth Amendment claims brought pursuant to 42 U.S.C. § 1983. The district court denied Defendant's motion for summary judgment, and Defendant now brings this timely interlocutory appeal, arguing that he was wrongfully denied qualified immunity. For the reasons explained below, we affirm.

## I. BACKGROUND

We must, for the purposes of this interlocutory appeal of the denial of qualified immunity, view the facts in the light most favorable to the plaintiff and draw all reasonable inferences in his favor. *McDonald v. Flake*, 814 F.3d 804, 814 (6th Cir. 2016); *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609–12 (6th Cir. 2015). In this procedural posture, we generally need not "engage in a plenary review of the record." *DiLuzio*, 796 F.3d at 611. Often, we "need look no further than the district court's opinion for the facts and inferences cited expressly therein." *Flake*, 814 F.3d at 813 (citing *DiLuzio*, 796 F.3d at 611). The district court's opinion properly construes the facts in the light

most favorable to Campbell. Thus, unless otherwise indicated, the facts contained herein are derived from the district court's opinion. *See, e.g.*, *Flake*, 814 F.3d at 813.

### A. Factual History

During the early evening of June 7, 2016, Campbell, an African American man, was driving his wife's minivan through Allen Park, Michigan. The minivan, which Campbell's wife had recently purchased, had a temporary license plate displayed in the back window. It was "broad daylight," visibility was "good," and one could easily see the temporary license plate from at least 60 feet away. (Dist. Ct. Op., ECF No. 85 at 6.)

Campbell drove past Mack, an Allen Park police officer parked on the shoulder of the freeway, monitoring traffic with Clyde, his police dog. Mack initiated a traffic stop on the minivan. Campbell pulled over. Mack exited his cruiser, approached the driver's side window of the minivan, and asked Campbell to produce his driver's license and registration. Campbell gave Mack his state identification card because he did not have a driver's license. He also handed Mack "all of the paperwork [he] had for the automobile." (*Id.* at 6.) Mack asked Campbell to step out of the vehicle, and Campbell complied. As Campbell exited the vehicle, his pants were fully zipped.

When Campbell exited the minivan, Mack "jostled" Campbell, handcuffed him "very tightly," conducted a patdown search of Campbell's person, and placed Campbell in the backseat of his cruiser. (*Id.*) Campbell complained that the handcuffs hurt his wrists and asked Mack to loosen them. Mack tightened the handcuffs and replied, "[t]hat's the loosest they're going to get." (*Id.* at 7.)

Mack also accused Campbell of having stolen the minivan. Campbell denied the accusation. He explained that he was traveling from his home to a friend's house, though he did not explicitly state where he lived.

Mack removed Clyde from his cruiser and "put the dog directly into" Campbell's minivan. (*Id.*) Campbell could not see what transpired inside the minivan, as he was still seated in the backseat of Mack's cruiser. While inside Mack's cruiser, Campbell never moved around or otherwise acted suspiciously. After a few minutes, Mack extracted Clyde from the minivan, returned Clyde to the cruiser, and searched the minivan himself.

A tow truck arrived, and Mack brought Campbell to the Allen Park police station to book him for driving with a suspended license. Mack never told Campbell of his supposed probable cause to search the minivan or informed him that he planned to conduct an additional search of Campbell's person once they arrived at the station.

When they arrived at the station, Mack brought Campbell to a booking area and removed Campbell's handcuffs.[1] Campbell again complained that the handcuffs had been too tight and held out his wrists to show Mack the bruises and marks the handcuffs had caused. Mack responded that "[h]andcuffs leave marks on everybody." (*Id.* at 8.)

Mack believed that Campbell was hiding contraband and decided to perform a strip search. Mack did not obtain a warrant prior to strip-searching Campbell. Mack ordered Campbell to enter a cage in the booking area and remove his pants. Campbell entered the cage but objected to removing his pants. Mack ordered Campbell to "get naked" and "drop" his "drawers." (*Id.*) Campbell continued to protest and incredulously asked, "You want me to get naked?" (Booking Video, ECF No. 75. at 7:56:47–:49.) Mack replied, "Yeah, you're getting naked. You're in holding facility. You're getting naked." (*Id.* at 7:56:47–:50.)

---

[1] A video camera captured the events that took place in the booking area. The video footage is choppy in places, the quality of the picture is relatively poor, and the camera angle combined with the position of the officers prevented the camera from capturing the events with sufficient clarity to resolve the disputed factual issues arising from the alleged strip and body cavity searches.

Mack stated that "we're getting down to the nitty gritty" because Clyde had indicated the presence of a narcotic odor, and he again ordered Campbell to "drop 'em." (*Id.* at 7:56:55–7:57:03.) Campbell responded that it was "not possible" that Clyde had indicated narcotic odor because he had not smoked in five years. (*Id.* at 7:57:03–:06.) Mack said that he did not care and again ordered Campbell to remove his underwear. Campbell stated that he had never heard of people being required to remove their clothes in jail, to which Mack responded, in a loud voice, "You're in a holding facility. You're in jail. You get naked in jail. Let's go! Drop your drawers." (*Id.* at 7:57:17–:25)

Mack again ordered Campbell to remove his underwear. Campbell replied, "I'm a man like you, man," and asked Mack why he would lie to him by falsely stating that he needed to remove his pants. (*Id.* at 7:57:33–:41.) Mack raised his voice and exclaimed, "I ain't lying to you. I've been doing this job for 22 years. I don't need to lie [to] you, man. You're a small fish in the sea. . . . Drop 'em. Your pants are unzipped. There ain't no reason for your pants to be unzipped. We're going to do this one way or another." (*Id.* at 7:57:42–7:58:00.)

Another officer entered the doorway of the booking area. Mack entered the cage, ordered Campbell to put his hands against the wall and spread his feet, and pulled down Campbell's pants. Mack then turned Campbell around to face him, pulled down the front of Campbell's underwear, bent down, and examined Campbell's genitals. Campbell became agitated and repeatedly complained, "Nah, you can't do that, man," to which Mack replied, "Yes I can, Yes I can." (*Id.* at 7:58:43–:49.) Mack then turned Campbell back around to face the cage and felt Campbell's buttocks through his underwear. Campbell continued to protest, repeating "You can't do that." (*Id.* at 7:58:55.) Mack pulled up Campbell's pants and responded, "the dog indicated," to which Campbell replied, "the dog didn't indicate anything." (*Id.* at 7:58:52–:56.)

Mack, still standing behind Campbell, then pulled down Campbell's pants and underwear again, bent down, and visually examined Campbell's buttocks. Mack then stated, "You've got it f\*\*\*ing tucked in your f\*\*\*ing ass crack, that's where you got it." (*Id.* at 7:59:01–:03.) Mack pulled up Campbell's pants, searched Campbell's pant legs and ankle area, and, finding no contraband, stood up and told the second officer, "He's got it tucked in his f\*\*\*ing ass crack." (*Id.* at 7:59:12–:15.) Campbell replied, "I ain't got nothing tucked." (*Id.* at 7:59:15–:16.)

A third officer came to the door of the booking area. Mack announced to the officer, "He's got it tucked underneath his balls." (*Id.* at 7:59:37–:40.) Campbell complained that Mack had "just got done looking under my balls" and did not uncover anything. (*Id.* at 7:59:40–:42.) Mack repeated that Campbell still had drugs "tucked underneath" his "balls" or his "ass." (*Id.* at 7:59:46–:51.)

Mack ordered Campbell to take off his wedding ring. Campbell quizzically replied, "my wedding ring?" Mack responded, "Yeah, your wedding ring comes off. You want to argue that?" (*Id.* at 7:59:54–8:00:01.) Mack then tossed Campbell's ring onto a table outside of the cage.

Mack reentered the cage and ordered Campbell to remove his underwear. Campbell repeated that he would not take his underwear off and continued to protest that Mack could not lawfully order him to "get naked." (*Id.* at 8:00:06–:14.) Mack partially pulled down Campbell's pants, but Campbell held his pants up and protested, stating that Mack had searched him "four or five times" and had already pulled his pants and underwear down. (*Id.* at 8:00:10–:18.)

Mack exited the cage and put blue latex gloves on his hands. Campbell continued to protest, stating that Mack had already looked underneath his pants and underwear. Campbell then stated that this was the most disrespectful situation he had ever been in in his life. Mack responded, "Well, then don't tuck shit underneath your nuts!" (*Id.* at 8:00:30–:40.)

Mack reentered the cage, along with two other officers also wearing blue latex gloves. One of the officers stated, "He's going to check, alright?" to which Campbell responded "No one's getting me naked. . . . He just got done checking on me two times." (*Id.* at 8:00:52–:59.) Mack ordered Campbell to turn around and spread his feet. Campbell complained "I just did that." (*Id.* at 8:01:02–:04.)

Mack reached into Campbell's pants and, with his hand outside of Campbell's underwear, felt around Campbell's genitals and buttocks region for approximately fifteen seconds. Towards the end of the search, Mack stated, "You've got it tucked in your ass." (*Id.* at 8:01:14–:16.) Campbell responded, "ain't nothing in my ass." (*Id.* at 8:01:17–:18.) According to Campbell, Mack then inserted his finger into Campbell's anus.[2] Mack then pulled up Campbell's pants, slapped Campbell twice on the chest, and told him "you can keep it," ostensibly referring the drugs that Campbell had purportedly hidden inside his anus. (*Id.* at 8:01:22–:24.)

Mack did not discover any drugs or contraband during the search.

**B. Procedural History**

Campbell filed a three-count Amended Complaint. However, only Count 1 is pertinent to this appeal.[3] In Count 1, Campbell asserted § 1983 claims against Mack in his individual capacity, alleging (1) that Mack violated Campbell's Fourth Amendment rights by (a) initiating the traffic

---

[2] Importantly, like the district court, we find that the video is inconclusive about the veracity of Campbell's allegation that Mack inserted his finger into Campbell's anus.

[3] In Count 2, Campbell asserted a municipal liability claim against Allen Park for failing to train and maintaining a custom or policy of performing unlawful strip searches and unlawful body cavity searches. In Count 3, Campbell asserted that Mack's conduct constituted intentional infliction of emotional distress under Michigan law. The district court granted in part and denied in part Defendants' motion for summary judgment with respect to Campbell's municipal liability claim against Allen Park, and denied Defendants' motion for summary judgment with respect to Campbell's state law claim against Mack. The district court's disposition of these claims is not before us.

stop without probable cause, (b) searching his minivan without probable cause, and (c) conducting two unlawful strip searches and one unlawful body cavity search, and (2) that Mack violated Campbell's First Amendment rights by tightening his handcuffs and conducting the strip and body cavity searches in retaliation for Campbell's objecting to Mack's conduct.

Mack moved for summary judgment based on qualified immunity with respect to Campbell's § 1983 claims. In order to prevail based on his claim of qualified immunity at the summary judgment stage, Mack would have to convince the district court that he did not violate Campbell's constitutional rights or that the constitutional rights that Campbell alleges that Mack violated were not clearly established.

The district court denied Mack's motion. The district court found that a genuine dispute of material fact existed regarding whether the traffic stop violated the Fourth Amendment and that Campbell's Fourth Amendment rights were clearly established. The district court further found that, because Mack was not entitled to qualified immunity on Campbell's Fourth Amendment claim arising from the traffic stop, he was also not entitled to summary judgment on Campbell's Fourth Amendment claims concerning conduct that occurred after the stop, *i.e.*, the search of the minivan, the two strip searches, and the body cavity search. The court also found that a genuine dispute of material fact existed regarding whether Mack retaliated against Campbell by tightening his handcuffs, conducting the strip and/or body cavity searches, and doing so in an overly aggressive manner, and that Campbell's First Amendment rights were clearly established.

This appeal followed.

## II. DISCUSSION

### A. Mack's Improper Attempt to Argue Disputed Factual Issues and Whether Mack Violated Campbell's Clearly-Established Constitutional Rights

Throughout his principal brief, Mack presents disputed material facts in the light most favorable to him and relies on his preferred version of the disputed material facts to argue that the district court improperly denied him qualified immunity. In response, Campbell argues that this Court lacks jurisdiction over this interlocutory appeal to the extent that Mack fails to concede the version of the facts most favorable to Campbell. In his reply brief, Mack asserts, disingenuously, that he conceded the facts in the light most favorable to Campbell.

We lack jurisdiction to resolve disputed factual issues in the context of this interlocutory appeal; this appeal is therefore subject to outright dismissal for lack of jurisdiction. We, nevertheless, will disentangle Mack's impermissible arguments involving disputed material facts from the purely legal issues to determine whether, viewing the facts in the light most favorable to Campbell, the district court properly denied Mack qualified immunity on Campbell's constitutional claims.

### 1. Relevant Legal Standards

"Under 28 U.S.C. § 1291, this Court has jurisdiction to hear an appeal only from a 'final decision' of the district court." *McCallum v. Geelhood*, 742 F. App'x 985, 990 (6th Cir. 2018). "As the denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291, it is generally not immediately appealable." *Flake*, 814 F.3d at 812. However, the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of [] § 1291 notwithstanding the absence of a final judgment." *DiLuzio*, 796 F.3d at 609 (quoting *Mitchell v. Forsyth*, 472 U.S. 511 (1985)).

"The denial of qualified immunity in a § 1983 case is a final, immediately appealable decision under the collateral order doctrine[,]" but "*only* to the extent the appeal presents a 'neat abstract issue[] of law.'" *Kindl v. City of Berkley*, 798 F.3d 391, 398 (6th Cir. 2015)) (alteration in original) (emphasis added) (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)); *see Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006) (holding that this Court may entertain an interlocutory appeal of a denial of qualified immunity "[o]nly to the extent that a summary judgment order denies qualified immunity based on a pure issue of law").

When faced with an interlocutory appeal challenging the denial of qualified immunity, we may review "the district court's *legal* determination that the defendant's actions violated a constitutional right or that the right was clearly established." *Flake*, 814 F.3d at 812. We may also review "a *legal* aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence," *id.* (citing *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014)), or whether the district court's factual findings are "blatantly contradicted by the record, so that no reasonable jury could believe it," *id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). But we may not review challenges to the plaintiff's account of "what actually occurred or why an action was taken[,]" the district court's acceptance of the plaintiff's proffered facts, or the inferences drawn by the district court from the plaintiff's facts. *Flake*, 814 F.3d at 813 (citing *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011)). Because these issues involve factual, not legal, disputes, we lack jurisdiction to consider them in the context of an interlocutory appeal. *Id.* at 812–13.

When a defendant improperly argues disputed factual issues in the context of an interlocutory appeal, we may dismiss the appeal for lack of jurisdiction. *See Kindl*, 798 F.3d at 398. However, rather than dismiss the appeal outright, we may alternatively "discard the fact-

based or 'evidence sufficiency' portion of [the defendant's] arguments—that is, any challenge to the district court's view of the facts or its associated inferences—and exercise the jurisdiction we do have to reconsider the district court's legal determinations based on the plaintiffs' version of the facts and the inferences as articulated by the district court." *Flake*, 814 F.3d at 814 (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005)); *see DiLuzio*, 796 F.3d at 611–12.

## 2. Application to the Matter at Hand

In its opinion on summary judgment, the district court identified numerous disputed material facts that precluded granting Mack's motion for summary judgment based on qualified immunity. The district court explicitly found that the parties had presented conflicting evidence on the following disputed factual issues: (1) "[w]hether the temporary license plate affixed to the back of Campbell's minivan was visible;" (2) "[w]hether Campbell told Mack where his 'home' was and whether Campbell said specifically what city he was coming from and what city he was driving to;" (3) "[w]hether Campbell's pants were unzipped when he stepped out of the minivan and whether and how his pants became unzipped during the encounter;" (4) "[h]ow much physical force Mack used to patdown and handcuff Campbell, and whether Mack tightened Campbell's cuffs after Campbell complained they were too tight;" (5) whether Mack walked Clyde, the police dog, around Campbell's minivan and whether Clyde indicated the presence of narcotic odor, or whether, alternatively, Mack placed Clyde directly inside the minivan; (6) whether Campbell moved around or otherwise acted suspiciously while he was handcuffed in the backseat of Mack's cruiser; (7) "[w]hether Mack told Campbell that Mack would need to perform a strip and/or body cavity search of Campbell at the Allen Park police station;" (8) "[w]hether Mack placed his hands inside of Campbell's underwear during the strip search;" and (9) "[w]hether Mack placed his

finger(s) inside Campbell's anus during the strip and/or body cavity search." (Dist. Ct. Op. at 10–11.)

In arguing that the district court improperly denied his motion for summary judgment based on qualified immunity, Mack relies on his preferred version of many of these facts, *which the district court explicitly found were disputed*. For example, Mack asserts that he initiated the traffic stop because the temporary license plate was not visible. He states that after he pulled Campbell over, Campbell said that he was traveling from a friend's house in Livonia or Westland to his own home in Wixom. Mack asserts that, when Campbell exited the minivan, his pants were unzipped. He contends that he performed a proper canine search of the vehicle, and that Clyde indicated the presence of narcotics by scratching the driver's side door. He claims that he observed Campbell shifting in the backseat of his cruiser and therefore believed that Campbell was trying to hide narcotics. He alleges that, prior to arriving at the Allen Park police station, he informed Campbell that, based on Campbell's suspicious movements and his pants being unzipped, Mack would need to conduct a strip search when they arrived at the station. And he avers that he never conducted a body cavity search or inserted his finger into Campbell's anus. As stated above, the district court found that Campbell furnished enough conflicting evidence on each of these points to create a genuine dispute of material fact.

Because Mack failed to accept Campbell's version of the facts, we could simply dismiss his appeal outright for lack of jurisdiction. *See, e.g.*, *Kindl*, 798 F.3d at 398. However, because this case presents important legal questions notwithstanding Mack's improper factual arguments, we will proceed to decide the purely legal issue of whether, viewing the facts in the light most favorable to Campbell, the district court properly denied Mack qualified immunity on Campbell's constitutional claims. *See Flake*, 814 F.3d at 814; *DiLuzio*, 796 F.3d at 611–12.

### B. Campbell's Fourth Amendment Claims

#### 1. Standard of Review

"We review de novo a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013) (citing *Tucker v. City of Richmond*, 388 F.3d 216, 219 (6th Cir. 2004)).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002)). When evaluating a motion for summary judgment, the court must "view[] [the evidence] in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). Further, "all reasonable inferences must be made in favor of the non-moving party." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000)). The moving party bears the burden of showing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986).

#### 2. Relevant Legal Principles

##### a. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). As the Supreme Court has

explained, "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

"The qualified immunity analysis entails two general steps, which can be considered in any order." *Godawa v. Byrd*, 798 F.3d 457, 462–63 (6th Cir. 2015) (citing *Pearson*, 555 U.S. at 236). "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Rafferty v. Trumbull Cty.*, 915 F.3d 1087, 1093 (6th Cir. 2019) (internal citation omitted). For a right to be clearly established, the contours of the right must be "sufficiently clear" such that a "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Plumhoff*, 572 U.S. at 779 (internal citation omitted).

"[T]he plaintiff bears the burden of showing that an officer is not entitled to the defense of qualified immunity." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (citing *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)).

### b. Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."[4] U.S. Const. amend. IV. "An ordinary traffic stop by

---

[4] The Supreme Court has repeatedly explained that the "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Mun. Court of City and Cty. of S.F.*, 387 U.S. 523, 528 (1967) (internal quotation marks omitted)).

a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (quoting *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "A warrantless search or seizure is '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Traffic stops of automobiles are well-established exceptions to the warrant requirement. *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010).

We apply different standards for ascertaining whether a traffic stop comports with the Constitution depending on the nature of the alleged infraction. *See, e.g.*, *United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016). Generally, an officer needs probable cause to stop a vehicle for a civil infraction and only reasonable suspicion to stop a vehicle for a criminal violation. *See id.* "Probable cause exists where 'the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009) (alterations in original) (quoting *Brinegar v. United States*, 338 U.S. 160, 175–176 (1949)). Reasonable suspicion exists if, under the totality of the circumstances, the officer has "'specific facts' that 'would lead a reasonable officer to suspect illicit activity.'" *United States v. Winters*, 782 F.3d 289, 298 (6th Cir. 2015) (citations omitted).

### 3. Application to the Matter at Hand

The district court did not determine whether Mack required reasonable suspicion or the higher probable cause showing to stop Campbell, instead finding that the standard was not outcome

determinative because, viewing the facts in the light most favorable to Campbell, Mack lacked *any* objective basis for the stop. On appeal, the parties do not challenge the district court's declining to definitively determine which standard applied.

We agree with the district court that the applicable Fourth Amendment standard is not outcome determinative in this case. Viewing the facts in the light most favorable to Campbell, Mack lacked probable cause or reasonable suspicion to believe that Campbell had committed a license plate violation. Campbell asserts in his affidavit that "the temporary plate [was] taped on all sides flush to the back window," and that "the temporary license [plate] was written in large black characters, easily visible for at least 20 yards behind the vehicle." (Campbell Aff., ECF No. 80-2 at PageID #963.) Moreover, Campbell has presented evidence that the stop occurred in "daylight" when "visibility was good." (*Id.*) Assuming the veracity of Campbell's facts, as the Court must at this stage, Mack lacked any objective basis for believing that Campbell had committed a civil offense. Therefore, Mack did not have probable cause or reasonable suspicion to stop Campbell's automobile. *See Collazo*, 818 F.3d at 253–54.

Mack is not entitled to qualified immunity on Campbell's Fourth Amendment claims. When the traffic stop occurred, it was clearly-established that an officer needs either probable cause or reasonable suspicion to conduct a traffic stop. *See, e.g.*, *Collazo*, 818 F.3d at 253–57. Because a reasonable jury could conclude that Mack lacked any objective basis for stopping Campbell, Mack is not entitled to qualified immunity.

Mack makes two arguments for why the district court erroneously denied him qualified immunity on Campbell's Fourth Amendment claim based on the traffic stop. Neither is persuasive.

First, Mack argues that he is entitled to qualified immunity because he subjectively believed that the minivan did not have a license plate. But it is hornbook law that the Fourth

Amendment's touchstone is "reasonableness," an objective standard. *See Brigham City*, 547 U.S. at 403. And while probable cause or reasonable suspicion certainly depends on the information that the officer possessed at the time of the challenged search or seizure, this Court analyzes an officer's subjective beliefs "from the perspective of a *reasonable officer* on the scene . . . ." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (emphasis added) (citations omitted). Viewing the evidence in the light most favorable to Campbell, a jury could conclude that Mack's subjective belief that the minivan did not have a license plate was unreasonable. Therefore, Mack is not entitled to qualified immunity. *Id.*; *see Anderson*, 483 U.S. at 641 (holding that qualified immunity turns on the objective reasonableness of an officer's actions, not an officer's subjective beliefs).

Mack fails to appreciate that the case he relies on undermines his argument. In *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994), the Fourth Circuit held that for probable cause to exist, "it is necessary . . . that the officer be *objectively reasonable* in believing that it is present." *Id.* at 174 (emphasis added). In this case, if the minivan's license plate were plainly visible and if the traffic stop occurred in broad daylight, as Campbell contends, a jury could conclude that Mack's subjective belief that the minivan lacked a license plate was unreasonable. Further, in holding that the officer had probable cause to believe that the plaintiff had committed misdemeanor larceny in *Rowland*, the Fourth Circuit emphasized that it was "not contested" that the officer witnessed the plaintiff pick up and fail to return money that another person had dropped. *Id.* By contrast, Campbell disputes that Mack failed to see the temporary license plate and has supported his assertion with evidence that the license plate was prominently displayed and plainly visible. Therefore, *Rowland* is inapposite.

Mack also asserts that the district court erred by concluding that Campbell provided evidence that he complied with the applicable Michigan license plate laws. According to Mack,

the undisputed evidence establishes that Campbell violated M.C.L. § 257.224(8), which requires that registration plates "be plainly readable from a distance of 100 feet during daylight," and M.C.L. § 257.225(2), which requires that registration plates be free from "foreign materials that obscure or partially obscure the registration information." Mack argues that the minivan's license plate violated these requirements because it was not visible from 100 feet away and because it was partially obscured by the tinted window, and that he therefore had probable cause to stop Campbell. In response, Campbell argues that Mack waived this argument because he raised it for the first time on appeal. He additionally asserts that the temporary license plate complied with MCL § 257.226a which, he argues, governs temporary license plates and, unlike M.C.L. § 257.224(8), does not contain a 100-foot visibility requirement.

We find that Mack forfeited his statutory argument by failing to raise it before the district court. *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 615 (6th Cir. 2014) (holding that "an argument not raised before the district court is waived on appeal to this Court"). Mack did not raise his statutory argument in his motion for summary judgment; in fact, neither his principal brief nor his reply brief cited M.C.L. § 257.224(8), M.C.L. § 257.225(2), or any other license plate-related statute, and Mack never argued that Campbell's license plate was not visible from 100 feet away. Mack has not articulated any reason why this Court should exercise its discretion to excuse his failure to raise this argument below. Further, this is not an "exceptional case" where applying this Court's standard rule would result in a "plain miscarriage of justice." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008). Accordingly, Mack forfeited his statutory argument, and we will not address it for the first time here.[5] *See Hayward*, 759 F.3d at 615.

---

[5] Even if we excused Mack's failure to raise his statutory argument below, we would still affirm the district court's denial of qualified immunity on Campbell's Fourth Amendment claims. While Michigan's intermediate court has held that the visibility requirements of M.C.L. § 257.225 apply to temporary license plates, *see People v. Stanley*, No. 319229, 2015 WL 1314665, at *2

### 4. Summary

Because a reasonable jury could find that Mack lacked any objective basis for the traffic stop, and because Campbell's Fourth Amendment rights were clearly established, qualified immunity does not shield Mack from Campbell's Fourth Amendment claim arising from the traffic stop.[6]

## C. Campbell's First Amendment Retaliation Claims

Mack argues that the district court erred by denying him qualified immunity on Campbell's First Amendment retaliation claims arising from Mack's tightening his handcuffs and performing the strip and body cavity searches. He asserts that tightening a suspect's handcuffs does not constitute an adverse action under clearly-established law. He further argues that no causal connection existed between Campbell's protected speech and strip and/or body cavity searches and that these searches do not constitute adverse actions that would chill First Amendment rights. In response, Campbell contends that excessive handcuffing can constitute an adverse action where, as here, the handcuffing causes a physical injury. He further asserts that the strip and/or body cavity searches constituted adverse actions because they were sufficiently severe to deter a person of

---

(Mich. Ct. App. Mar. 24, 2015), a genuine factual dispute exists about whether the temporary license plate complied with § 257.225's 100-foot visibility requirement. Campbell testified that "the temporary plate [was] taped on all sides flush to the back window," and that "the temporary license [plate] was written in large black characters, easily visible for *at least 20 yards* behind the vehicle." (Campbell Aff., ECF No. 80-2 at PageID #963) (emphasis added). Campbell never testified that the license plate was not visible from 100 feet away. Given that the existence of probable cause constitutes a jury question in § 1983 cases, *see Green v. Throckmorton*, 681 F.3d 853, 865 (6th Cir. 2012), and given the fact that Mack has the burden to establish the absence of any genuine issues of material fact at the summary judgment stage, *see* Fed. R. Civ. P. 56(a), Campbell's testimony that the license plate was visible from *at least* 20 yards away would be sufficient to create a genuine dispute of material fact about whether the license plate complied with § 257.225's 100-foot visibility requirement.

[6] As explained above, the district court did not reach the merits of Campbell's other Fourth Amendment claims. Accordingly, we similarly limit our analysis of the Fourth Amendment issue to the claim arising from the traffic stop.

ordinary firmness from engaging in protected speech. He additionally argues that he established causation because a jury could conclude that Mack conducted the strip and/or body cavity searches out of retaliation for Campbell objecting to the initial strip search.

### 1. Relevant Legal Principles

In *Thaddeus-X v. Blatter*, this Court articulated a three-part test for First Amendment retaliation claims:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Mack conceded below that Campbell engaged in protected conduct when he complained about Mack's actions during the traffic stop and the strip and/or body cavity searches. Accordingly, to determine whether Campbell established a constitutional violation for purposes of summary judgment, we need only evaluate whether he satisfied the second and third prongs of his First Amendment retaliation claim; that is, whether Mack took an adverse action against Campbell and, if so, whether a causal connection existed between Campbell's complaints and Mack's adverse action. *See id.* at 394.

Regarding the second element—whether the officer took an adverse action that would deter a person of ordinary firmness from engaging in the protected conduct—we have "emphasize[d] that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id.* at 398. Further, "[w]hether a retaliatory action is sufficiently severe to deter a

person of ordinary firmness from exercising his or her rights is a question of fact." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). "Thus, unless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." *Id.* (quoting *Thaddeus–X*, 175 F.3d at 398).

Regarding the third element—whether a causal connection existed between the protected conduct and the adverse action—we evaluate "the totality of the circumstances to determine whether an inference of retaliatory motive [may] be drawn." *Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010) (citing *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010)). To establish causation, the plaintiff need only demonstrate "that his protected conduct was a motivating factor" for the retaliatory acts. *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018) (quoting *Thaddeus–X*, 175 F.3d at 399). "[T]he motivating factor prong of a First Amendment retaliation case can be supported by circumstantial evidence, with temporal proximity aiding in the analysis." *Spencer v. City of Catlettsburg*, 506 F. App'x 392, 396 (6th Cir. 2012) (citing *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 412 n.15 (6th Cir. 2011)). Because "[p]roof of an official's retaliatory intent rarely will be supported by direct evidence of such intent[,] . . . claims involving proof of a [defendant's] intent seldom lend themselves to summary disposition." *Holzemer*, 621 F.3d at 525 (citation omitted).

### 2. Application to the Matter at Hand

Campbell has satisfied the second element of his retaliation claim for purposes of summary judgment. Campbell has presented evidence that, after he complained about the handcuffs being too tight, Mack replied, "[t]hat's the loosest they're going to get" and tightened them even more, causing injuries to Campbell's wrists that required medical treatment. Further, Campbell has presented evidence that, after he protested Mack's initial demand that Campbell remove his

underwear, Mack conducted invasive strip and/or body cavity searches, and did so in an overly aggressive manner, including by jostling Campbell's genitals and inserting his finger into Campbell's anus. Mack's alleged retaliatory actions cannot be characterized as "inconsequential." *Bell*, 308 F.3d at 603. A reasonable jury could conclude that Mack's actions would deter a person of ordinary firmness from continuing to complain about his or her allegedly unlawful treatment. *See id.* Therefore, Campbell has satisfied his burden of demonstrating that Mack took adverse actions against him. *Thaddeus-X*, 175 F.3d at 394.

Mack asserts that an officer's tightening a suspect's handcuffs fails to rise to the level of an adverse action as a matter of law. In support of his argument, Mack relies on two district court cases from Illinois, neither of which apply here. In *Verser v. Smith*, No. 14 C 1187, 2017 WL 528381 (N.D. Ill. Feb. 9, 2017), the district court held that tightening an inmate's handcuffs did not rise to the level of an adverse action because the handcuffing amounted to "a de minimis use of force from which [the plaintiff] did not suffer any serious injury." *Id.* at *8. Similarly, the handcuffing in *Heard v. Hardy*, No. 11 C 6683, 2013 WL 3812102 (N.D. Ill. July 22, 2013), did not rise to the level of an adverse action because the plaintiff "suffered no injury and sought no medical attention." *Id.* at *3. But Campbell did not merely suffer "de minimis" injuries; he sought medical treatment at a hospital and received bandages for his wrists. Accordingly, the district court cases cited by Mack are inapposite.

Campbell has satisfied the third element of his retaliation claim for purposes of summary judgment. A jury could conclude that Mack tightened Campbell's handcuffs in retaliation for Campbell's complaining that they were too tight, particularly given the temporal proximity between Campbell's complaint and Mack's tightening and the fact that Mack facetiously remarked "[t]hat's the loosest they're going to get" when he tightened them. *See Spencer*, 506 F. App'x at

396. A jury could similarly find that Mack performed the strip and/or body cavity searches, and did so in an aggressive, intimidating, and hostile manner, because of Campbell's protests. The video footage depicts Mack growing increasingly frustrated with Campbell's continued protests in the face of Mack's orders to remove his underwear. For example, when Campbell continued to object to Mack's demands that he "get naked," Mack excoriated Campbell, exclaiming, "You're in holding facility. You're in jail. You get naked in jail. Let's go! Drop your drawers." (Booking Video, ECF No. 75. at 7:57:17–:25) Thereafter, Mack repeatedly accused Campbell of hiding contraband in his "f***ing ass crack" (*Id.* at 7:59:01–03; 7:59:13–:15) or "tucked underneath his balls." (*Id.* at 7:59:36–:39.) And later, after Campbell expressed incredulity that Mack would require him to remove his wedding ring, Mack responded, "Yeah, your wedding ring comes off. You want to argue that?" and carelessly tossed Campbell's ring onto a table. (*Id.* at 7:59:54–8:00:04.) Furthermore, Campbell presented evidence that Mack aggressively groped his genitals and inserted his finger into Campbell's anus during the ensuing body cavity search. Under the totality of the circumstances, a reasonable jury could find that Mack conducted the strip and/or body cavity searches, and carried them out in an overly aggressive manner, in retaliation for Campbell's protests. *See Holzemer*, 621 F.3d at 526.

Having determined that Campbell established a First Amendment violation for purposes of summary judgment, we must analyze whether Campbell's First Amendment right to be free from retaliation was clearly-established. We find that it was. Therefore, Mack is not entitled to qualified immunity on Campbell's First Amendment retaliation claim.

"[I]t is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983." *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) (citing cases). Further, "the courts that have considered qualified immunity in

the context of a retaliation claim have focused on the retaliatory intent of the defendant" rather than on the retaliatory action the defendant allegedly undertook. *Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998). This is because "[t]he unlawful intent inherent in such a retaliatory action places it beyond the scope of a police officer's qualified immunity if the right retaliated against was clearly established." *Id.* (quoting *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990)). Recognizing that the unlawful intent aspect of a public official's retaliatory action violates clearly-established law, this Court has denied qualified immunity to a police officer who arrested a citizen in retaliation for protesting and failing to comply with his order to return to his home, *McCurdy v. Montgomery Cty.*, 240 F.3d 512, 516 (6th Cir. 2001), and to a police officer who effectuated an arrest in retaliation for being called a derogatory term, *Greene v. Barber*, 310 F.3d 889, 897–98 (6th Cir. 2002).

Mack is not entitled to qualified immunity with respect to Campbell's First Amendment retaliation claim. When the events at issue occurred, the right to be free from retaliation at the hands of police officers for asserting one's First Amendment rights was "sufficiently clear" that a reasonable officer would have understood that retaliating against Campbell as a result of his complaints would violate his First Amendment rights. *See al-Kidd*, 563 U.S. at 741. Further, just as the police officers in *McCurdy* and *Greene* should have known that arresting someone in retaliation for asserting his or her First Amendment rights violated clearly-established law, Mack should have known that further tightening Campbell's handcuffs and engaging in aggressive strip search and/or body cavity searches in retaliation for Campbell's asserting his First-Amendment rights violated clearly-established law. In fact, Mack argues that while "this case involves a claim of a retaliatory search, rather than a retaliatory arrest or prosecution, [this] is a distinction without a difference, particularly in the context of applying qualified immunity." (Mack Br. at 39.) Mack

makes this statement in arguing that qualified immunity protects searches supported by probable cause from First Amendment retaliation claims, just as it protects arrests and prosecutions supported by probable cause. But the inverse is also true—just as arrests or prosecutions *without* probable cause can support a First Amendment retaliation claim, so can a retaliatory search.

Mack argues that the district court erred by denying him qualified immunity on this claim because it failed to cite a case with sufficiently analogous facts to place him on notice that his conduct violated Campbell's First Amendment rights. However, "the Supreme Court 'do[es] not require a case directly on point [if] existing precedent [has] placed the statutory or constitutional question beyond debate.'" *Rafferty*, 915 F.3d at 1097 (alterations in original) (quoting *al-Kidd*, 563 U.S. at 741). "Instead, the operative inquiry is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Based on Sixth Circuit precedent that existed before 2016, a reasonable officer would have known that retaliating against Campbell for complaining about Mack's conduct by tightening his handcuffs to the point of injury, subjecting him to strip and/or body cavity searches, and conducting these searches in an overly aggressive manner would violate the First Amendment. Accordingly, Campbell's failure to locate a case with perfectly analogous facts does not entitle Mack to qualified immunity.

### 3. Summary

Because a reasonable jury could find that Mack tightened Campbell's handcuffs to the point of injury, subjected him to strip and/or body cavity searches, and conducted these searches in an overly aggressive manner in retaliation for Campbell's protected conduct, and because Campbell's First Amendment rights were clearly established, Mack is not entitled to qualified immunity on Campbell's First Amendment retaliation claim.

## III.  Conclusion

For the reasons stated above, we affirm the district court's denial of Mack's motion for summary judgment based on qualified immunity.